FILED by ___ D.C.
ELECTRONIC

MAR. 21, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## 08-20748-CIV-HOEVELER/BROWN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

APPLE CORPS LIMITED and APPLE RECORDS, INC.

Plaintiffs,

*- against -*

FUEGO ENTERTAINMENT, INC., ECHO-FUEGO
MUSIC GROUP LLC, ECHO-VISTA INC., HUGO M.
CANCIO and JEFFREY COLLINS,

Defendants.

Case No:

## PLAINTIFFS' MOTION FOR EMERGENCY PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, Apple Corps Limited and Apple Records, Inc. (collectively "Apple")

respectfully MOVE pursuant to Fed. R. Civ Pro. 65, and L.R. 7.1 E for an emergency preliminary

Injunction, against Defendants, Fuego Entertainment, Inc., Echo-Fuego Music Group LLC,

Echo-Vista Inc. (collectively, "Fuego"), Hugo M. Cancio, and Jeffrey Collins.

### PRELIMINARY STATMENT

By this motion, Apple -- The Beatles' company -- seeks to enjoin defendants from

illegally exploiting illicit bootleg recordings of live performances of The Beatles. Defendants

have obtained surreptitiously recorded tapes of musical performances of The Beatles purportedly

from Hamburg Germany's Star-Club in 1962 and, in a deliberate effort to trade on The Beatles'

fame and creative endeavors, are threatening to commercially release these bootleg recordings in

a calculated effort by defendants to enrich themselves at plaintiffs' expense.

Defendants' unconscionable conduct is being pursued despite the fact that defendant

Jeffrey Collins -- who was sentenced to three years probation in 1996 for violating New Jersey's

sound recording piracy statutes --   previously agreed that *"[o]bviously, without [plaintiffs']*

Dockets.Justia.com

*consent we have absolutely no intention of commercially releasing the album. We are also willing to sign an undertaking not to do so.*"

The release of these unauthorized recordings and the marketing campaign that promotes it are, and will be, damaging to plaintiffs beyond calculation. The Beatles' priceless reputation, the invaluable goodwill associated with their name and the superior quality of plaintiffs' performances and recordings -- all created and protected through the vigilant and carefully controlled efforts of The Beatles over the course of over four decades -- are being threatened by defendants' flagrant attempt to reap what they have not sown. In so doing, defendants are committing willful violations of plaintiffs' rights under the Copyright Act and the Lanham Act, as well as plaintiffs' rights under state laws protecting rights of publicity and reputation. Defendants' conduct subjects the public to inferior quality recordings of Beatles performances, made without The Beatles' permission and without their control, which conduct also dilutes and tarnishes the extraordinarily valuable image associated with The Beatles and the unprecedented craftsmanship associated with their music.

As set forth more fully herein, plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable injury in the absence of an injunction that stops defendants from commercially exploiting the bootleg recordings of The Beatles' performances and from wrongfully appropriating plaintiffs' valuable trademarks and names and likenesses of The Beatles in connection with the marketing, promotion and sale of the illicit bootleg recordings.

## STATEMENT OF FACTS

### A.    THE BEATLES' FAME

The Beatles are the top selling and most famous group of popular musicians and recording artists of all time. The unique and priceless reputation and tremendous good will established by The Beatles is a result of (a) the extensive sales and advertising of hundreds of

2

musical compositions and recordings bearing The Beatles' name; (b) the fame and acclaim surrounding the musical services of The Beatles and the popularity of the motion pictures in which The Beatles have appeared; (c) the widespread public recognition of the name "The Beatles" and the association of that name with the individual owners of Apple; and (d) the unprecedented quality of The Beatles' musical compositions, recordings and services.

The quality of The Beatles' music is evidenced by their receipt of every major recording and performing artist award, including numerous GRAMMY awards, an Academy Award, and dozens of gold, platinum and multi-platinum recordings. In 1988, The Beatles were inducted into the Rock & Roll Hall of Fame. Through the extraordinary efforts and talents of Sir Paul McCartney, John Lennon, George Harrison and Richard Starkey, this good will associated with The Beatles has given great value to the exclusive right of Apple to exploit THE BEATLES trademark as well as The Beatles' names and likenesses and performances.[1]

Through The Beatles' creative efforts and critically acclaimed professional activities, the substantial use of The Beatles name, the hugely successful sales of goods and services bearing The Beatles' name, and the world-wide publicity that The Beatles have received and continue to receive, The Beatles name and trademark is highly distinctive and famous. Apple also owns three U.S. trademark registrations for THE BEATLES. *See* LiCalsi Aff., Ex. B.

**B.    THE BEATLES' STAR CLUB PERFORMANCES**

In January of 1962 The Beatles were under a management contract with Brian Epstein. As their manager, Mr. Epstein handled every aspect of The Beatles' professional musical careers, including procuring employment for The Beatles, arranging recording sessions for The Beatles, and negotiating all contracts relating to The Beatles' professional interests. On January 22,

---

[1] Apple owns the exclusive right by assignment from The Beatles on March 5, 1980, to all merchandising rights of The Beatles and all other intangible rights in the name "The Beatles" and in the likenesses and performances of The Beatles. *See* Exhibit A annexed to the Declaration of Paul V. LiCalsi, dated March 21, 2008.

1962, Mr. Epstein entered into a contract on The Beatles' behalf for a series of performances by The Beatles at a new venue in Hamburg, Germany, called the Star-Club (the "January 1962 Star-Club Contract"). *See* LiCalsi Aff., Ex. C. The January 1962 Star-Club Contract pertained to performances of The Beatles at the club for the period April 13 to May 31, 1962, and detailed the parties' rights and obligations, including the band's work schedule, the allowance of 15 minute breaks after every hour played, monthly salary, accommodations, meals, overtime pay, and travel costs. Notably, there is no mention of a right to record any of The Beatles' performances.

Following their April and May 1962 Star-Club performances, The Beatles auditioned for EMI's Parlophone label and in June of 1962 EMI signed The Beatles to a long sought after and much prized recording contract (the "June 1962 EMI Contract"). *See* LiCalsi Aff., Ex. D. Significantly, paragraph 3 of the June 1962 EMI Contract, which Mr. Epstein entered into on The Beatles' behalf, gave EMI the exclusive right to record any performance of The Beatles and required Mr. Epstein to agree that The Beatles would not permit any third party to record any of their performances in any manner which might be offered to the public.

In August 1962, The Beatles' drummer, Pete Best, was replaced by Ringo Starr. Shortly thereafter, the professional careers of The Beatles skyrocketed with the release of the single "Love Me Do" in October of 1962. The Beatles reached the music charts and were immediately thrust into the limelight in England, including prestige appearances on BBC radio, television appearances in London, better-paid concert engagements, interviews with national music publications, record store signing engagements, photographic sessions and a variety of other promotional activities. Despite their new found fame, The Beatles returned for two final visits to the Star-Club in November and again, for the last time, in December of 1962.

1779840.1/41741-00002

## C.    THE BEATLES NEVER PERMITTED THE RECORDING OF THEIR STAR-CLUB PERFORMANCES

The Beatles never permitted anyone to record their live performances at the Star-Club. First, it was virtually impossible to approach any of The Beatles directly about any commercial matter as their manager Brian Epstein handled all negotiations with the clubs and tightly controlled all aspects of The Beatles' professional affairs. Second, and consistent with this, the January 1962 Star-Club Contract makes no mention of any right to record live performances of The Beatles. Third, the June 1962 EMI Contract expressly forbid The Beatles from permitting any third party from recording their performances. Fourth, after The Beatles made the Star-Club famous, the club did eventually record the performances of its bands for record release in Germany, however, the Star-Club did not begin this practice until 1963 -- after The Beatles last performance there. If it had been the practice for the Star-Club to record bands prior to 1963, there would be many nights of Beatles performances on tape and those tapes would have been released commercially worldwide years ago. No such authorized material, however, has ever been released. Finally, and critically, George Harrison, Paul McCartney and Richard Starkey provided sworn testimony in prior litigations confirming that The Beatles never provided consent to record their performances at the Star-Club. A sampling of prior sworn testimony follows:[2]

Excerpt from the deposition of George Harrison, July 10, 1992, in *Apple Corps Limited, and Apple Records, Inc. v. Sony Music Entertainment, Inc. et al.*, 91 Civ. 7465 (S.D.N.Y.):

> Q.    At the time that you played at the Star-Club, do you ever recall anyone making a tape of performances?
>
> A.    No.
>
> . . . .
>
> Q.    And do you recall, sir, with certainty that no such tapes were ever made or you simply don't recall one way or the other?

---

[2] *See* LiCalsi Aff., Ex. E.

A.    We were in Germany on various occasions probably for a total fo 12 months and I never saw a tape machine ever or a microphone or anything. . . . .    There was never any indication or permission given or even anybody asking us, as far as my recollection goes.

Q.    . . . . Are you pretty certain that this is the case or is that simply a belief that you have?

A.    That is how it was for me.  We were there to play.  We were not there to record.  No request had ever been made to record and no permission was granted.

Excerpt from the deposition of Paul McCartney, July 9, 1992, in *Apple Corps Limited, and Apple Records, Inc. v. Sony Music Entertainment, Inc. et al.*, 91 Civ. 7465 (S.D.N.Y.):

Q.    . . . you have no recollection of any recording – at that time of any recording being done of any performances at all, correct?

A.    That is true.

Excerpt from the deposition of Richard Starkey, September 9, 1992, in *Apple Corps Limited, and Apple Records, Inc. v. Sony Music Entertainment, Inc. et al.*, 91 Civ. 7465 (S.D.N.Y.):

Q.    Do you recall whether any of the performances at the Star Club were taped?

A.    I don't remember any of them being taped at that time.

Q.    Is it that you don't recall one way or the other or you have a clear recollection that they were not taped?

A.    As far as I can recall, no, there was no taping, no tape made of the performances in the Star Club.

**D.    ILLICIT BEATLES' STAR-CLUB RECORDINGS**

Despite lack of consent, surreptitiously recorded bootlegs of The Beatles' Star-Club performances have surfaced over the years.    Plaintiffs successfully prevented several impermissible attempts to release these unauthorized recordings.  In 1991, plaintiffs stopped Sony Music Entertainment, Inc. and others from releasing a Beatles Star-Club bootleg in an action in the U.S. District Court, Southern District of New York captioned *Apple Corps Limited, and Apple Records, Inc. v. Sony Music Ent., Inc. et al.*, 91 Civ. 7465.  There, defendants

6

attempted to release unauthorized Star-Club performances of The Beatles complete with packaging that made impermissible use of The Beatles' trademarks, trade names and names and likenesses. Defendants asserted that the recordings at issue, allegedly from December of 1962, were made with permission with a hand-held recorder but, faced, in part, with testimony from Messrs. McCartney, Harrison and Starkey that they never provided such permission, the defendants agreed to enter into a Consent Order, dated September 14, 1993 and defendants were permanently enjoined from exploiting the Star-Club recordings. *See* LiClasi Aff., Exhibit F.

Several years later, plaintiffs again stopped the unauthorized exploitation of Star-Club performances in a lawsuit initiated in England's High Court of Justice, Chancery Division captioned *George Harrison, James Paul McCartney, Richard Starkey and Yoko Ono Lennon (as executrix of the will of John Winston Ono Lennon) v. Lingasong Music Limited*, (CH 1996 H No: 3983). There, the Court held that plaintiffs did not consent to the recording of their performances and that by selling copies of illicit recordings, defendant had infringed plaintiffs' exclusive rights of reproduction and distribution of their performances. *See* LiCalsi Aff, Ex. G.

**E.    DEFENDANT JEFFREY COLLINS' EXPLOITATION OF INFRINGING RECORDINGS**

Collins' conduct in connection with illicit musical recordings is well documented. In 1996 he was sentenced to three years probation on a criminal plea to violating New Jersey's Sound Recording Piracy Statutes in connection with non-Beatles recordings. *See* LiCalsi Aff., Ex. H. Shortly before his criminal sentencing, Collins attempted to manufacture and distribute an unauthorized recording of 15 tracks of live performances of The Beatles at the Star-Club on an album entitled "*Jammin' With . . . The Beatles '62*" (hereinafter, the "1995 Star-Club Bootleg"). Plaintiffs sent a cease and desist letter to Collins (*see* LiCalsi Aff., Ex. I) and in July 1995, Collins responded, stating in part:

> "[W]e are more than upset to hear that the Apple Corporation is not willing to work with us on this project. Obviously, without

> their consent we have absolutely no intention of commercially
> releasing the album.  We are also willing to sign an undertaking
> not to do so."

*See* LiCalsi Aff., Ex. J.  Collins then attempted to sell plaintiffs the bootleg recordings to Apple

"for an acceptable offer commensurate with that of a private collector."  *See* LiCalsi Aff., Ex. J.

Plaintiffs declined the offer, however.  *See* LiCalsi Aff., Ex. K.

### F.   DEFENDANTS' CURRENT INFRINGING ACTIVITY

Twelve years after he agreed not to exploit the 1995 Star-Club Bootleg, Collins

resurfaced.  On January 10, 2008, Fuego announced that it had acquired, through an association

with Collins, the 15 tracks of previously unreleased live performances of The Beatles at the Star-

Club.  Fuego announced that the recordings "will be released" under the Echo-Fuego joint

venture "in the near future."  *See* LiCalsi Aff., Ex. L.  Defendants have announced that the title

of the soon-to-be released infringing recordings (the "Infringing Recordings") will be *"Jamming*

*with Beatles and Friends, Star Club, Hamburg, 1962"* -- nearly the identical title to Collins'

1995 Star-Club Bootleg.  *See* LiCalsi Aff., Ex. M.

In addition to the press release announcing defendants' plans to commercially release the

Infringing Recordings, Fuego also audio streamed portions of the illicit recordings on their

website fuegoentertainment.net with the following sales pitch:

> Listen to the historic Beatles "Lost" tape from the first ever live
> performance of John, Paul, George and Ringo at the Star Club in
> Hamburg, Germany and the future Fuego release of these tracks
> following digital remastering. One full track and 3 clips from the
> historic "Lost" tape Beatles album to be released soon by Fuego
> are available now on Fuego Plus. You must be a member of Fuego
> Plus to listen to this preview of the album.

*See* LiCalsi Aff., Ex. N.[3]

---

[3] Thus, in exchange for a fee, the public was able to join defendants' "Fuego Plus" and listen to the entire
2 minute 57 second live performance of *"I Saw Her Standing There,"* 30 seconds of *"Hippy Hippy
Shake,"* 30 seconds of *"A Taste of Honey,"* and 36 seconds of *"Lovesick Blues."*  *See* LiCalsi Aff., Ex. O.

1770840.1/41741-00002

Defendants admit that the "tapes are in bad condition after sitting for over 35 years in Mr. Collins' collection" and that the tapes have been "processed to remove noise but the sound quality can be improved much more" and prior "to releasing the final album the tapes will be digitally remastered using the latest technology." *See* LiCalsi Aff., Ex. O.

Defendants have promoted their for-profit Fuego Plus feature, which allowed access to the illicit recordings, through unauthorized use of THE BEATLES trademarks emblazoned across Fuego's website urging the public to "UPGRADE YOUR MEMBERSHIP TO ACCESS LOST TRACKS NEVER HEARD BEFORE." *See* LiCalsi Aff., Ex. O. Defendants further exploited The Beatles' names and likenesses on the Fuego website through the use of a large photograph of The Beatles to market the Infringing Recordings. *Id.*

Defendants do not indicate how or when the illicit recordings of The Beatles' performances were made. Their website simply notes that the tapes were "hand delivered to Mr. Collins by the DJ he had booked into the Star Club the night the recordings were made." *See* LiCalsi Aff., Ex. O. At one point, defendants state that the recordings of live Beatles performances were made in 1962 "a short time before their signing with E.M.I." during "the very first time that Ringo Starr actually played with The Beatles 'live' after replacing Pete Best on the drums." *See* LiCalsi Aff., Ex. L. Elsewhere, defendants state that the 15 tracks were recorded in "late 1963 at the Star Club" -- long after The Beatles' last performance at the Star-Club, on December 31, 1962. *See* LiCalsi Aff., Ex. O. Nor do defendants explain the basis of their purported rights to the Infringing Recordings. Fuego only states that the Star-Club "recorded most groups that appeared at their club in the late 50s and early 60s under a performance contract that included payment in full for any live recordings made at their club." *See* LiCalsi Aff., Ex. L. Undermining this are (1) the Star-Club did not open until 1962; and (2) The Beatles' either

---

Fuego's website further announced that "Fuego Plus members will be offered the opportunity to purchase the complete digitally remastered CD prior to it's [sic] general release." *Id.*

appeared at the Star-Club while under an exclusive June 1962 EMI Contract prohibiting the recording of their performances by third parties, or appeared pursuant to the January 1962 Star-Club Contract which makes no mention of a right to record any of The Beatles' performances. George Harrison's sworn trial testimony from the *Lingasong* action dated May 6, 1998 is supportive. In connection with a question about whether the Star-Club had a "practice of recording the performances and enabling the bands, if they wanted, to listen to their performances the next day and to adjust sound levels and so forth," Mr. Harrison replied:

> A.  "[T]he actual recordings that the Star Club started to do was long after The Beatles had been and left Hamburg. Then they caught on, 'we should be recording all these bands,' and then they set up the equipment. . . . "
>
> . . . .
>
> Q.  You know that the [Star] club had plans to make recordings and release them?
>
> A.  In 1963, after The Beatles never went back to the place.
>
> Q.  And there were discussions about these plans in 1962?
>
> A.  Not with us.
>
> Q.  Did you not know in 1962 of the plan to release for commercial exploitation –
>
> A.  No.
>
> Q.  - recordings that were made at the club of live performances?
>
> A.  They only started making recordings of the Star Club after we had been there. So I did not know about that and I was not interested in that. Anyway, we had our own record deal, we were set up at that point . . . . Record agreements like we signed with EMI are exclusive agreements. It specifically says under the duration of your contract you will not record for any other people and will not allow other recordings to be made. We were very happy to finally get that EMI agreement so we were in no position, first of all, to make another recording and we certainly did not want an inferior recording, which that has proven to be.

10

*See* LiCalsi Aff., Ex. P.

On January 16, 2008, plaintiffs sent a cease and desist objecting to defendants' conduct. *See* LiCalsi Aff., Ex. Q.  Thereafter, Cancio agreed to forward to plaintiffs' counsel a copy of the Infringing Recordings, but later, "after further consideration and at the request of Mr. Collins," Cancio advised that defendants would not be forwarding a copy of the unauthorized recordings. Cancio also expressly reserved defendants' right "to commercially release these recordings in the future."  *See* LiCalsi Aff., Ex. R.  On or about January 28, 2008, after much negotiation, defendants ceased streaming the Infringing Recordings on their website but continued to reserve their right to do so.  On February 2, 2008, Collins provided an interview to the Today Show on CNBC where he discussed defendants' plans to commercially exploit the Infringing Recordings, mentioning 2011 as a possible date after which time -- according to Collins' erroneous view -- the Infringing Recordings would be in the public domain.

Then, on February 21, 2008, Fuego issued a press release announcing that it has "commenced the digital re-mastering and enhancement process to improve the quality of the historic Beatles' lost tapes in preparation for its future release."  *See* LiCalsi Aff., Ex. M. Thereafter, on March 5, 2008, Cancio confirmed that despite plaintiffs' objections, defendants expect to release the illicit recordings commercially and that he welcomes the opportunity to "battle" plaintiffs in the "public arena."

## G.    THE TIMING OF THIS MOTION

Despite plaintiffs' objections, Defendants plan to release the Infringing Recordings commercially.  While defendants have never said when they plan to release the Infringing Recordings, given defendants' ability to do so via their website, the Infringing Recordings could be available globally at any time and in an instant.  These circumstances present a grave risk of irreparable harm to plaintiffs unless defendants' conduct is enjoined.

## ARGUMENT

### A.    PLAINTIFFS MEET THE STANDARD FOR INJUNCTIVE RELIEF

Plaintiffs meet the required elements for a preliminary injunction. Plaintiffs are entitled to preliminary injunctive relief upon showing: (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) that injury to plaintiffs outweighs whatever harm an injunction would cause to defendants; and (4) that the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Plaintiffs satisfy all the requirements, and are thus entitled to injunctive relief. Moreover, injunctive relief is appropriate where there is a "cognizable danger of recurrent violation." *F.T.C. v. Capital Choice Consumer Credit, Inc.* 2004 WL 5149998 at *43 (S.D. Fla. 2004).

### B.    PLAINTIFFS WILL SUCCEED ON THE MERITS

### 1.    *Defendants Are Threatening To Unlawfully Traffic In Sound Recordings*

In order to provide federal statutory protection directly to unrecorded live musical performances, and to address the growing market for the unauthorized distribution of bootleg recordings thereof, Congress enacted an anti-bootlegging statute as part of the Copyright Act that prohibits unauthorized fixation and trafficking in sound recordings.[4] Specifically, liability attaches where, as here, without the consent of the performers, defendants (i) fix sounds of a live musical performance in a copy or phonorecord, or reproduce copies or phonorecords of such a performance from an unauthorized fixation; and (ii) transmit or otherwise communicate to the public the sounds or sounds and images of a live musical performance; or (iii) distribute or offer

---

[4] *See United States v. Moghadam*, 175 F.3d 1269, 1271-72 (11th Cir. 1999). "Bootlegging" is the making of "an unauthorized copy of a commercially unreleased performance," as opposed to "piracy," which refers to an unauthorized duplication of an authorized recording. *Id.*, 175 F.3d at 1272 n. 3 (citation and internal quotation marks omitted).

1770840_1/41741-00002

to distribute, sell or offer to sell, or traffic in any copy or phonorecord of an unauthorized fixation regardless of whether the fixations occurred in the United States.  17 U.S.C. § 1101(a).

As set forth above, The Beatles never permitted the recording of their live performances at the Star-Club and never granted anyone rights to produce, sell, or otherwise exploit such material.  As also set forth above, defendant Collins recognized this as he previously acknowledged that he would not release the illicit recordings in his possession without plaintiffs' consent.  Defendants nevertheless are now threatening to release the Infringing Recordings in direct, willful and blatant contravention of the Copyright Act's anti-bootlegging statute.  *See Moghadam, supra*, 175 F.3d 1269 (the Eleventh Circuit affirmed defendants' criminal conviction for the same conduct under a sister statute providing criminal liability, 18 U.S.C. § 2319A).

2.   *Defendants Are Threatening To Violate Plaintiffs' Rights Under Common Law Copyright And Under State Unfair Competition Law*

Defendants' unauthorized bootlegging also violates plaintiffs' common law copyright.[5] The directly analogous case of *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (N.Y. Sup. Ct., 1950) *affirmed*, 107 N.Y.S.2d 795 (1st Dep't 1951) is instructive.  In that case, defendants surreptitiously recorded live performances of the famed Metropolitan Opera that aired over the radio and then sold the inferior quality recordings to the public.  The Court held that defendants had "appropriated and exploited for their own benefit the result of the expenditures, labor and skill of the Metropolitan Opera" (*id.* at 487) and issued an

---

[5] The Infringing Recordings were purportedly made in 1962.  As such, they are not protected by federal statutory copyright laws because they were fixed prior to February 15, 1972.  *See generally Dowling v. United States*, 473 U.S. 207, 211, n. 4 (1985).  But the Copyright Act makes clear that with respect to pre-1972 sound recordings, common law rights "shall not be annulled or limited . . . ." 17 U.S.C. § 301(c). *See generally, Capitol Records, Inc. v. Naxos of America, Inc.*, 797 N.Y.S.2d 352, 360 (2d Cir. 2005); *Bridgeport Music, Inc. v. Dimension Films*, 401 F.3d 647, 651 n. 18 (6th Cir. 2004); *CBS, Inc. v. Garrod*, 622 F. Supp. 532 (M.D. Fla. 1985).  Courts have thus protected pre-1972 sound recordings under a theory of "common law copyright," the assertion of a "property right" and/or upon a theory of "unfair competition." *See Sony Music Ent., Inc. v. Clark Entertainment Group*, 183 B.R. 72, 80 (D.N.J. 1995).

injunction. In so doing, the Court applied the broad principle that "property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality and a court of equity will penetrate and restrain every guise resorted to by the wrongdoer."[6] *Id.* at 492. Significantly, the Court held that plaintiff did not abandon its common law rights in its performance by publicly performing the opera and broadcasting it over the radio. *Id.* at 494.

The case of *CBS, Inc. v. Garrod*, 622 F. Supp. 532 (M.D. Fla. 1985) similarly recognized liability for record piracy of pre-1972 sound recordings based on plaintiff's protectible interest in its common law copyrights. *Id.* at 535.[7] In addition, *Garrod* characterized defendants' piracy as violating plaintiff's "protectible property interest in the professional expertise invested in the recordings" and also analyzed liability generally under state unfair competition principles. The Court found that the three elements under Florida law of unfair competition for record piracy, "(1) time, labor and money expended by the plaintiff, (2) competition, and (3) commercial damage, were all present and concluded that the damage from defendants' piracy is "irreparable and cannot be adequately measured or compensated by monetary damages." *Id.* at 536.

---

[6] New York's highest court in *Capitol Records, Inc. v. Naxos of America, Inc.,* 797 N.Y.S.2d 352, 361, 365-368 (2d Cir. 2005) reviewed the development of common law copyright and implicitly noted that the analysis in *Metropolitan Opera* fell under a common law copyright theory.

[7] *Metropolitan Opera* and *Garrod* are consistent with well-settled case law. *See, e.g., Capitol Records, Inc. v. Naxos of America, Inc.,* 797 N.Y.S.2d 352, 360 (2d Cir. 2005) (confirming common law copyright protection for pre-1972 sound recordings); *Firma Melodiya v. ZYX Music GmbH,* 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995) (granting injunction against unauthorized distribution of copies of pre-1972 recordings based on infringement of common law copyright and unfair competition); *Rostropovich v. Koch Int'l Corp.,* 1995 WL 104123, *6 (S.D.N.Y. Mar. 7, 1995) (recognizing that a performer has a property interest in his performance); *Apple Corps Ltd. v. Adirondack Group,* 476 N.Y.S.2d 716 (Sup. Ct. NY Co. 1983) (granting injunction based on principles of common law copyright and unfair competition where defendants misappropriated the righ of The Beatles' company, Apple, to manufacture and distribute recordings of The Beatles' pre-1972 Christmas messages); *A & M Records, Inc. v. M.V.C. Distributing Corp.,* 574 F.2d 312 (6th Cir. 1977) (recognizing common law copyright rights attaching to pre-1972 sound recordings and affirming injunction against unauthorized reproductions); *Walsh v. Radio Corporation of America,* 275 F.2d 220 (2d Cir. 1960) (recognizing that band leader Glenn Miller had common law copyright to make recordings of his live performances); *Gieseking v. Urania Records,* 155 N.Y.S.2d 171 (Sup. Ct. NY Co. 1956) (performer has a property interest in his performance).

Here, in the analogous context of record bootlegging, the defendants are threatening to misappropriate for their own commercial benefit the substantial creative endeavors of The Beatles by releasing illicit recordings of proprietary Beatles performances. In addition to violating plaintiffs' common law copyrights by infringing upon plaintiffs' exclusive right to reproduce and exploit the live performances of The Beatles, defendants are also threatening to usurp plaintiffs' creative labor for their own commercial benefit thereby directly competing against authorized Beatles recordings to plaintiffs' commercial damage.

3.    *Defendants Are Liable Under Federal And State Dilution Laws*

The federal trademark dilution statute, section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), protects the distinctive quality of a trademark. *Moseley v. V. Secret Catalogue, Inc.*, 123 S.Ct. 1115, 1124 (2003). Likelihood of success on a federal dilution claims requires that (1) plaintiff's mark be famous, (2) that defendant adopted the mark after it became famous, (3) dilution of plaintiff's mark, and (4) use of the mark by defendant commercially. *PetMed Express, Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004). Plaintiffs satisfy all four elements. THE BEATLES trademarks are recognized worldwide and, as amply set forth above and in plaintiffs' Complaint, are unquestionably famous.[8] Defendants are intending to use THE BEATLES name in connection with the commercial exploitation of Infringing Recordings and defendants' exploitation of THE BEATLES marks dilutes the name THE BEATLES both by blurring and by tarnishment.[9]

---

[8] A mark is "famous" if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

[9] Blurring refers to impairment of the distinctiveness of a famous mark, 15 U.S.C. §§ 1125(c)(2)(B). Tarnishment is harm to the reputation of a famous mark (1125(c)(2)(C)) which may occur when the famous mark is linked to products of poor quality. *Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.*, 161 F.Supp.2d 1339, 1355 (S.D. Fla. 2001).

Here, in a classic example of tarnishment, the Infringing Recordings are of inferior quality to that of any recording approved for release by plaintiffs. The illicit recordings, made in a raucous nightclub and without The Beatles' supervision or control "are in bad condition" and any exploitation will similarly be without plaintiffs' supervision or control. Defendants' use of THE BEATLES mark to promote their inferior quality recordings is designed with predatory intent to trade on the affirmative associations attached to The Beatles name and undermines the unparalleled reputation for quality associated with The Beatles and THE BEATLES marks. In appropriating the value of the name and reputation for artistic excellence of The Beatles, defendants endanger the reputation and goodwill of The Beatles.

Defendants are also threatening to cause dilution by blurring through use of THE BEATLES mark on the Infringing Recordings. If allowed, the distinctive quality of THE BEATLES mark will be whittled away and consumers may no longer perceive The Beatles' recordings as emanating from a single source or origin. *Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.,* 161 F.Supp.2d 1339, 1355 (S.D. Fla. 2001).

Plaintiffs are also likely to succeed on the merits of their claim for violation of Florida's dilution statute which also has a tarnishment prong (injury to business reputation) and a blurring prong (dilution of the distinctive quality of the trademark). *See* § 495.151 Florida Statutes; *Sakura Japanese Steakhouse Inc. v. Lin Yan, Inc.*, 827 So.2d 1105, 1107 (Fla. App. 2 Dist. 2002); *Jaguar Cars Ltd. v. Skandrani*, 771 F. Supp. 1178, 1185 (S.D. Fla. 1991) (plaintiffs are entitled to prevent the "whittling away of an established trademark's selling power and value through its unauthorized use" and are "entitled to prevent this dimunition of their goodwill").

**4.    *Defendants Are Threatening To Violate Plaintiffs' Right of Publicity***

Florida's right of publicity statute prohibits the public use of the name, portrait, photograph, or other likeness of any natural person for any commercial or advertising purpose

16

without consent. § 540.08 Florida Statutes. Here, defendants' conduct clearly violates Apple's right of publicity. At no time did Apple authorize or consent to defendants' use of the names and likenesses of The Beatles. Nevertheless, defendants are threatening to exploit The Beatles' names and likenesses in connection with the commercial release of the Infringing Recordings. *See Gridiron.com, Inc. v. National Football League Player's Assoc., Inc.*, 106 F. Supp. 2d 1309, 1316 (S.D. Fla. 2000) (injunction granted where athletes' photos were displayed on website in violation of owner's exclusive right to exploit the athletes' names, likenesses, and personalities).

## 5.    *Defendants Are Threatening To Violate Plaintiffs' Trademark Rights*

Defendants are threatening to exploit Apple's registered trademarks THE BEATLES without authorization. To establish trademark infringement under section 32 of the Lanham Act, 15 U.S.C. § 1114(1), a plaintiff must show that its mark is being used by defendant without consent and that such use is likely to deceive or cause confusion. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998); *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178 (11th Cir. 1984). Defendants are planning to release the Infringing Recordings with the title "*Jamming with Beatles and Friends, Star Club, Hamburg, 1962*" yet have no consent from Apple to use any of its registered trademarks for THE BEATLES. *See* LiCalsi Aff., Ex. B. Moreover, defendants' conduct is intended to confuse and deceive the public into the erroneous belief that defendants are licensees of plaintiffs, or are somehow authorized, endorsed, sponsored or approved by plaintiffs.

Application of the factors relevant to the likelihood of confusion analysis compels this conclusion.[10]    Significantly, since defendants are intentionally adopting THE BEATLES trademark for illicit purposes and are intending to derive commercial benefit THE BEATLES

---

[10] These factors include (1) the strength of the mark; (2) the similarity of the marks; (3) the similarity of the products; (4) the similarity of the customers and retail outlets; (5) the similarity of advertising campaigns; (6) defendants' intent; and (7) evidence of actual confusion. *Babbit*, 38 F.3d at 1178.

trademark, likelihood of confusion can be found as a matter of law. *Babbit*, 38 F.3d at 1179; *see also Bauer Lamp Co., Inc. v. Schaffer*, 941 F.2d 1165, 1172 (11th Cir. 1991) (intentional infringement creates a presumption of likelihood of confusion).[11]

## C.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY

Where, as in this case, there are allegations of infringement under the Copyright Act and Lanham Act, and plaintiffs have established a likelihood of success on the merits, irreparable injury is presumed. *Sony Music Entertainment, Inc. v. Global Arts Productions*, 45 F. Supp. 2d 1345 (S.D. Fla. 1999) ("A party seeking a preliminary injunction for copyright violations need only show that there is a likelihood of success on the merits, and need not show irreparable harm"); *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1029 (11th Cir. 1989) (trademark infringement "by its nature causes irreparable harm").; *Laboratorios Roldan v. Tex Int'l, Inc.*, 902 F. Supp. 1555, 1570-71 (S.D. Fla. 1995) (same).

In the copyright context, *Sony Music* recognized that "[i]njunctive relief is a traditional remedy for copyright infringement and is especially favored where there is a history of continuing infringement and a substantial threat of continued infringement." 45 F. Supp. 2d at 1347. In that case, the Court enjoined defendants' record piracy noting that the harm to plaintiffs would be substantial in the absence of an injunction since defendants were usurping plaintiffs' "exclusive control over the method and means of the exploitation of their unique intellectual property." *Id.* at 1348.[12] In the trademark context, *Tally-Ho* noted recognized that in trademark

---

[11] Plaintiffs will also prevail on their claims of false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). As the Eleventh Circuit has noted, recovery under section 1114(a) will result in recovery under section 1125(a) since the latter statute is broader in scope and the analysis is the same. *Babbit*, 38 F.3d at 1181.

[12] *See also C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007) (irreparable harm where defendant threatened to sell infringing, poor quality products causing injury to plaintiff's reputation, loss of goodwill, and injury to the integrity of plaintiff's copyrighted materials, particularly since the infringing products could not meet the quality control standards of plaintiff);

infringement cases "there is no[] adequate remedy at law to redress infringement."  889 F.2d at 1029 (citations omitted).  There, the Court granted an injunction due to the "reputational and financial" harm to the plaintiff given its four year investment in its product and trademark.  *Id.*[13]

Moreover, once the Infringing Recordings are released to the pubic, plaintiffs will suffer damage that cannot be reversed.  *See Pharmerica, Inc. v. Arledge*, 2007 WL 865510 at *8 (M.D. Fla. 2007) (plaintiff would not be able to "undisclosed" any of the misappropriated trade secrets).

### D.    PLAINTIFFS' INJURY OUTWEIGHS ANY PURPORTED HARM TO DEFENDANTS

The balance of equities favors plaintiffs.  The Beatles' unique and priceless reputation and tremendous good will and the time, labor, money and enormous creative effort that has been dedicated to safeguarding The Beatles' artistic legacy, is at risk.  For defendants, the preliminary injunction would not affect other products or services of defendants that may be authorized – only the Infringing Recordings and a "company cannot build a business on infringements and then argue that enforcing the law will cripple that business" *C.B. Fleet*, 510 F. Supp. 2d at 1083 (citations omitted); *see also Bulova Corp. v. Bulova Do Brasil Com.*, 144 F. Supp. 1329 (S.D. Fla. 2001) ("as a willful infringer, Defendant should not be immunized from injunctive remedy by the extent of his investment"); *Nailtiques* 1997 WL 244746 at *5 (defendants "should not be heard to complain about hardship when their actions, undertaken with apparent prior knowledge of Plaintiff's trademarks and trade dress, imply bad faith").

### E.    GRANTING AN INJUNCTION SERVES THE PUBLIC INTEREST

A preliminary injunction will prevent defendants from misappropriating the "skills, creative energies, and resources" that plaintiffs have invested in their property rights and "the

---

*Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, 1997 WL 244746 at *5 (S.D. Fla. 1997) ("the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the Defendant's goods") (citations omitted).

[13] *See also McDonald's Corporation v. Robertson, supra*, 147 F.3d at 1310 ("trademark actions are common venues for the issuance of preliminary injunctions") (citations omitted).

1770840_1/41741-00002

public interest can only be served by upholding copyright protection and preventing misappropriation of protected works." *C.B. Fleet*, 510 F. Supp. 2d at 1084. Moreover, the public "is entitled to be free from deception and confusion" and in a trademark or unfair competition case, "its interests are paramount." *Laboratorios Roldan v. Tex Intern, Inc.*, 902 F. Supp. 1555, 1571 (S.D. Fla. 1995).

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court grant them preliminary relief, enjoining defendants from manufacturing, distributing, selling, promoting, copying, licensing, trafficking or otherwise disseminating, exploiting or exposing the public to any recordings of live Beatles' performances at the Star-Club; and from using, in commerce, the trademark, name or likenesses of THE BEATLES in connection with the Infringing Recordings or otherwise, together with such other and further relief as the Court deems just and proper.

Dated: March 21, 2008

WOLFE & GOLDSTEIN, P.A.
100 S.E. 2nd Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 381-7115
Facsimile: (305) 381-7116

Richard Wolfe
FL Bar No: 355607

Paul Licalsi, Esq.
Howard Weller, Esq.
MITCHELL SILBERBERG & KNUPP LLP
12 East 49th Street -- 30th Floor
New York, NY 10017
Telephone:   (212) 509-3900
Fax:         (917) 546-7677

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

APPLE CORPS LIMITED and APPLE RECORDS, INC.
    Plaintiffs,

v.

FUEGO ENTERTAINMENT, INC., ECHO-FUEGO
MUSIC GROUP LLC, ECHO-VISTA INC., HUGO M.
CANCIO and JEFFREY COLLINS,
    Defendants.

## TRANSMITTAL DECLARATION OF PAUL V. LiCALSI
## IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Paul V. LiCalsi declares under the penalty of perjury as follows:

1.      I am a partner of Mitchell Silberberg & Knupp LLP, counsel to Plaintiffs Apple Corps Limited and Apple Records, Inc. ("Plaintiffs") in the above-captioned action. I make this declaration in support of Plaintiffs' motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a).

2.      Attached hereto as Exhibit A is a true and correct copy of four assignments, each dated March 5, 1980 signed by the 4 individual members of the Beatles in favor of Apple Corps limited.

3.      Attached hereto as Exhibit B. is a true and correct copy of three trademark registrations for the mark "the Beatles" reflecting ownership of same by Apple Corps limited, printed from the US PTO website.

4.    Attached hereto as exhibit C. is a true and correct copy of the contract signed by the manager of the Beatles for the April and May 1962 performances at the Star club, together with an English translation of same

5.    Attached hereto as exhibit D. is a true and correct copy of a contract signed between the Paralphone Company Limited and Brian Epstein, as the manager of the Beatles dated the fourth day of June 1962.

6.    Attached hereto as exhibit E are true and correct copies of excerpts of deposition testimony given by George Harrison on July 10, 1982, by James Paul McCartney on July 9, 1992 and by Ringo Starr on September 9, all in the case styled Apple Corps limited and Apple Records Inc. against Sony Music Entertainment Inc., et al

7.    Attached hereto as exhibit F. is a true and correct copy of the consent order and order of discontinuance entered in the Apple Corps Limited against Sony Music Entertainment at al case dated September 14, 1993.

8.    Attached hereto as exhibit G is a true and correct copy of the order entered in the case styled George Harrison et al and Lingasong music Ltd. dated May 8, 1998 together with a true and correct excerpt copy of the transcript of said proceedings.

9.    Attached hereto as exhibit H. is a true and correct copy of indictment number S. O. 692 -- 95 in the case styled the state of New Jersey versus Jeffrey Collins dated June 1, 1995 together with a true and correct copy of the sentencing order dated January 11, 1996.

10.    Attached hereto as exhibit I is a true and correct copy of a cease and desist letter sent by myself on June 22, 1995 to Jeffrey Collins.

11.    Attached hereto as exhibit J is a true and correct copy of a letter sent by Jeffrey Collins dated July 17, 1995.

12.    Attached hereto as exhibit K. is a true and correct copy of a letter sent to Jeffrey Collins dated October 24, 1995

13.    Attached hereto as exhibit L. is a true and correct copy of a press release of Fuego Entertainment dated January 10, 2008.

14.    Attached hereto as exhibit M is a true and  correct copy of a press release of Fuego entertainment dated February 21, 2008.

15.    Attached hereto as exhibit N is a true and correct copy of an excerpt of a portion of the Fuego Entertainment.net website.

16.    Attached hereto as exhibit O is a true and correct copy of an excerpt of a portion of the Fuego Entertainment.net website.

17.    Attached hereto as exhibit P. is a true and correct copy of an excerpt of trial testimony given by George Harrison in the case styled George Harrison et al v Lingasong music Ltd. dated May 6, 1998.

18.    Attached hereto as exhibit Q is a true and correct copy of a cease and desist letter sent to the defendants dated January 16, 2008.

19.    Attached hereto  as exhibit R is a true and  correct copy e-mails exchanged between Plaintiff's counsel and the defendants dated January 22, 2008.

DATED:  March 21, 2008

Paul V. LiCalsi (PL6622)

# EXHIBIT  A

March 5, 1980

Apple Corps. Limited
29/30 St. James's Street
London SW1 1HB England

Gentlemen:

This will evidence and confirm the transfer to Apple Corps. Limited of the merchandising and other intangible rights in the name "The Beatles," and in the likenesses and performances of the undersigned as Beatles, to the extent not previously distributed to Apple Corps. Limited on dissolution of the Beatles and Co. partnership, pursuant to the Settlement Agreement of December 29, 1974.

Nothing contained herein shall, in any way, lessen or affect the requirement of unanimous consent provided for in the Articles of Association of Apple Corps. Limited.

GEORGE HARRISON

JOHN LENNON

PAUL McCARTNEY

RINGO STARR

ACCEPTED:

APPLE CORPS. LIMITED

By

March 5, 1980

Apple Corps. Limited
29/30 St. James's Street
London SW1 1HB England

Gentlemen:

This will evidence and confirm the transfer to Apple Corps. Limited of the merchandising and other intangible rights in the name "The Beatles," and in the likenesses and performances of the undersigned as Beatles, to the extent not previously distributed to Apple Corps. Limited on dissolution of the Beatles and Co. partnership, pursuant to the Settlement Agreement of December 29, 1974.

Nothing contained herein shall, in any way, lessen or affect the requirement of unanimous consent provided for in the Articles of Association of Apple Corps. Limited.

GEORGE HARRISON

JOHN LENNON

PAUL McCARTNEY

RINGO STARR

ACCEPTED:

APPLE CORPS. LIMITED

By

March 5, 1980

Apple Corps. Limited
29/30 St. James's Street
London SW1 1HB England

Gentlemen:

This will evidence and confirm the transfer to Apple Corps. Limited of the merchandising and other intangible rights in the name "The Beatles," and in the likenesses and performances of the undersigned as Beatles, to the extent not previously distributed to Apple Corps. Limited on dissolution of the Beatles and Co. partnership, pursuant to the Settlement Agreement of December 29, 1974.

Nothing contained herein shall, in any way, lessen or affect the requirement of unanimous consent provided for in the Articles of Association of Apple Corps. Limited.

_____
GEORGE HARRISON

_____
JOHN LENNON

_____
PAUL McCARTNEY

_____
RINGO STARR

ACCEPTED:

APPLE CORPS. LIMITED

By _____

March 5, 1980

Apple Corps. Limited
29/30 St. James's Street
London SW 1JT England

Gentlemen:

This will evidence and confirm the transfer to Apple Corps. Limited of the merchandising and other intangible rights in the name "The Beatles," and in the likenesses and performances of the undersigned as Beatles, to the extent previously distributed to Apple Corps. Limited on dissolution of the Beatles and Co. partnership, pursuant to the Settlement Agreement of December 29, 1974.

Nothing contained herein shall, in any way, lessen or affect the requirement of unanimous consent provided for in the Articles of Association of Apple Corps. Limited.

_____
GEORGE HARRISON

_____
JOHN LENNON

_____
PAUL McCARTNEY

_____
RICHARD STARKEY

ACCEPTED:

APPLE CORPS, LIMITED

By _____

# EXHIBIT  B

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Mar 20 04:10:34 EDT 2008*

`TESS HOME` `NEW USER` `STRUCTURED` `FREE FORM` `BROWSE DICT` `SEARCH OG` `BOTTOM` `HELP`

[Logout] Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

`TARR Status` `ASSIGN Status` `TDR` `TTAB Status` *( Use the "Back" button of the Internet Browser to return to TESS)*

## THE BEATLES

| | |
|---|---|
| **Word Mark** | THE BEATLES |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: [ gramophone records featuring music; ] pre-recorded audio tape cassettes featuring music; and audio compact discs featuring music |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 74693640 |
| **Filing Date** | June 26, 1995 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | March 11, 1997 |
| **Registration Number** | 2066226 |
| **Registration Date** | June 3, 1997 |
| **Owner** | (REGISTRANT) Apple Corps Limited COMPANY UNITED KINGDOM 27 Ovington Square London ENGLAND SW3 1LJ |
| **Attorney of Record** | BRIAN J MCNAMARA |
| **Prior Registrations** | 1752120 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20070317. |
| **Renewal** | 1ST RENEWAL 20070317 |
| **Live/Dead Indicator** | LIVE |

http://tess2.uspto.gov/bin/showfield?f=doc&state=ti35bv.2.1                      3/20/2008

Trademark Electronic Search System (TESS)                     Page 2 of 2

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

].HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Mar 20 04:10:34 EDT 2008*



Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | ( Use the "Back" button of the Internet

*Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | THE BEATLES |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: gramophone records featuring music; pre-recorded audio tape cassettes featuring music; audio compact discs featuring music; pre-recorded video tape cassettes. featuring music; video laser discs featuring music. FIRST USE: 19630200. FIRST USE IN COMMERCE: 19630200 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74693840 |
| **Filing Date** | June 26, 1995 |
| **Current Filing Basis** | 1A;44E |
| **Original Filing Basis** | 1A;44D |
| **Published for Opposition** | December 16, 2003 |
| **Registration Number** | 2820559 |
| **Registration Date** | March 9, 2004 |
| **Owner** | (REGISTRANT) Apple Corps Limited COMPANY UNITED KINGDOM 27 Ovington Square London UNITED KINGDOM SW3 1LJ |
| **Priority Date** | April 13, 1988 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

|.HOME ] SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

http://tess2.uspto.gov/bin/showfield?f=doc&state=ti35bv.4.1                    3/20/2008

Trademark Electronic Search System (TESS)                                        Page 2 of 2



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Mar 20 04:10:34 EDT 2008*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP

Logout Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

TARR Status | ASSIGN Status | TDR | TTAB Status ( *Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

**Word Mark** THE BEATLES

**Goods and Services**
IC 003. US 051 052. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270404) COSMETICS AND NON-MEDICATED TOILET PREPARATIONS; NAMELY, PERFUME, TOILET SOAPS, FACIAL MAKE-UP, HAIR SHAMPOO AND CONDITIONER, AND NAIL POLISH

IC 014. US 028. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270405) CLOCKS AND WATCHES

IC 016. US 037 038. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270406) STICKERS, PHOTOGRAPH ALBUMS, POSTERS, DECALS, GREETING CARDS, PICTURES, PHOTOGRAPHIC PRINTS, SHEET MUSIC, ADDRESS LABELS, SHIPPING LABELS, PICTURE POSTCARDS, BLANK POSTCARDS, STATIONERY WRITING PAPER AND ENVELOPES, STATIONERY BOXES, PAPER AND PLASTIC TRANSPARENCIES, ADDRESS BOOKS, APPOINTMENT BOOKS, NOTEBOOKS, PICTURE BOOKS, AUTOGRAPH ALBUMS AND CALENDARS

IC 018. US 001 002 003 022 041. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270407) UMBRELLAS, WALLETS, PURSES, [ DUFFEL BAGS ] AND TOTE BAGS

IC 020. US 002 032 050. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270408) HAND-HELD MIRRORS, FURNITURE MIRRORS, ORNAMENTS OF WOOD, WAX, PLASTER AND PLASTIC (NOT INCLUDING CHRISTMAS TREE ORNAMENTS), FIGURINES OF WOOD, WAX, PLASTER AND PASTIC AND BOXES OF PLASTIC AND WOOD

IC 021. US 002 030 033. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270409) DOMESTIC USE GLASSWARE; NAMELY, FIGURINES OF GLASS, PORCELAIN AND EARTHENWARE, ORNAMENTAL GLASSWARE; NAMELY, GLASS STATUETTES AND MINIATURE SCULPTURES, AND BOXES OF GLASS, PORCELAIN AND EARTHENWARE

IC 024. US 042. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270410) BATH LINEN, BED SPREADS, PILLOWCASES, BEDDING SHEETS, QUILT COVERS AND TOWELS

IC 025. US 022 039. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270411) CLOTHING FOR MEN, WOMEN AND CHILDREN; NAMELY, APRONS, BATH ROBES, BATHING TRUNKS, SWIMSUITS, SWIMSUIT COVERS, BELTS, COATS, DRESSES, SMOCKS, SKIRTS, HEADWEAR, [ JACKETS, ]

Trademark Electronic Search System (TESS)                                    Page 2 of 2

JUMPERS, [ JERSEYS, ] PULLOVERS, SWEATERS, SWEATSHIRTS, T-SHIRTS, SHIRTS, BLOUSES, UNDERWEAR, PAJAMAS, NIGHTGOWNS, SOCKS, TROUSERS, DUNGAREES, JEANS, TANK TOPS AND SUN-TOPS

IC 026. US 040. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270412) BELT BUCKLES NOT OF PRECIOUS METAL AND PATCHES FOR CLOTHING

IC 028. US 022 023 038 050. G & S: (BASED ON UNITED KINGDOM REGISTRATION 1270413) TOYS, GAMES AND PLAYTHINGS; NAMELY, JIG-SAW PUZZLES, DOLLS, [ BOARD GAMES, ] CARD GAMES, PUZZLE GAMES AND PARLOUR GAMES

| | |
|---|---|
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 73638094 |
| Filing Date | January 2, 1987 |
| Current Filing Basis | 44E |
| Original Filing Basis | 44D |
| Published for Opposition | July 21, 1992 |
| Registration Number | 1752120 |
| Registration Date | February 16, 1993 |
| Owner | (REGISTRANT) APPLE CORPS LIMITED CORPORATION UNITED KINGDOM 6 STRATTON STREET LONDON W1X 5FD ENGLAND |
| Attorney of Record | ARTHUR SCHWARTZ |
| Priority Date | July 2, 1986 |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT  C

# Musiker-Vertrag

(Zwischen Kapellenleiter als Beauftragten des Unternehmens und Einzelmusiker)

Zwischen Manager   BRIAN EPSTEIN  For and on behalf of "The Beatles"

dem Kapellenleiter (J. LENNON, P. McCARTNEY, G. HARRISON, P. BEST) and

der   in this contract termed as the "Band"      Und

als Beauftragten des Unternehmens

dem Inhaber  HORST FASCHER in Hamburg

Herrn

und Herrn         Straße      Vertragschließender I

Vertragschließender II

wird folgender Vertrag geschlossen:

1. Vertragschließender I verpflichtet Vertragschließenden II als
   a) für die Zeit vom 13 th April 1962 bis 31st May 1962 (beide Tage eingeschlossen)
   b) für die Zeit vom ............ bis auf weiteres; Kündigung erfolgt mit Monatsfrist am Letzten des Vormonats.

2. Vertragschließender II ist verpflichtet, täglich 6 Stunden, und zwar:
   a) wochentags, nachmittags von .... bis .... Uhr, abends von 8 bis 2 Uhr,
   sonnabends, nachmittags von .... bis .... Uhr, abends von 8 bis 4 Uhr,
   sonn- u. feiertags, nachmittags von .... bis .... Uhr, abends von 8 bis 2 Uhr,
   im Durchschnitt wöchentlich .... .... Stunden zur Verfügung zu stehen.
   b) Die Pausen werden wie folgt festgelegt: 1 Hour play and 15 min. break
   c) Die Instrumente .... .... sind in ordnungsmäßigem Zustand zu stellen.

3. Vertragschließender II erhält ein Monatsgehalt von DM  Weekly payment 2,000 D.M. (500 D.M. thereach
   in Worten: Five hundred deutsche Mark Deutsche Mark; Teilzahlung erfolgt am   member of the Band)
   in Höhe von DM .... .... .... End .... chaung am Monatsschluß;
   a) Die dem Vertragschließenden II gewährte freie Verpflegung und Unterkunft wird auf das Gehalt mit
   DM .... .... in Anrechnung gebracht.
   b) Überstunden werden mit DM 60 D.M. .... je Stunde vergütet. (15 D. .... per each member
                  of the Band)

4. Als Zureiseentschädigung erhält Vertragschließender II Gepäckkosten und Fahrgeld 2. Klasse  DM 660 D.M.
5. Die Vertragschließenden folgen dem Vertrag unter Bezugnahme auf die Bestimmungen des gel (160 D.M. per each member of the Band) tigen Tarifvertrages.

6. Die nach dem Tarifvertrag zu gewährenden spielfreien Tage werden wie folgt festgelegt:

7. Rauchen und Trinken auf dem Podium ist nicht erlaubt.

8. ... m Vertragschließenden II ist ein anderweitiges Auftreten in ähnlichen Betrieben während der Dauer des Vertrages nur
   mit vorheriger Genehmigung des Vertragschließenden I gestattet. (For the duration of the Contract

9. a) Wer diesen Vertrag bricht, hat eine Vertragsstrafe in Höhe eines halben Monatsgehaltes zu zahlen. Die Geltendmachung
   eines weiteren Schadens ist nicht ausgeschlossen.
   b) Wird Vertragschließender II vertragsbrüchig, so ist er verpflichtet, auch dem Kapellenleiter den dadurch entstandenen
   Schaden zu ersetzen.

10. Gerichtsstand für Streitigkeiten aus diesem Vertrag ist: .... .... Hamburg

11. Besondere Vereinbarungen:    It is agreed that the Band will not perform
    or accept other engagements in Germany from the date of this
    Contract until the Contract becomes effective.

22nd January 1962    /den     19 ....        22nd January 1962     19

Name: ....                   Name ....          

(Unterschrift des Vertragschließenden I)      (Unterschrift des Vertragschließenden II)

Wohnort: Manfred Weissleder KG.         Wohnort: 12-14, Wh .eobapel .... ...1

Wohnung: Hamburg-St. Pauli, Große Freiheit 39     Wohnung: ....     Liverpool 1.   1

<u>MUSICIAN CONTRACT</u>

BETWEEN THE MANAGER BRIAN EPSTEIN FOR AND ON BEHALF OF THE BEATLES
AND HORST FASCHER IN HAMBURG.

1.    The following contract has been made:

    (a) The first party obliges the second party as between the
        period of 13 April 1962 to 31 May 1962 (including both
        dates).

2.    The second party is obliged to be available everyday for six
    hours.
    (a) weekday evenings between 8 and 2
        Saturday evenings between 8 and 4
        Sundays and Holidays between 8 and 2

    (b) The breaks are determined as follows:
        One hour play and fifteen minute break.

    (c) The instruments... have to be kept in a proper
        condition.

                          Weekly payment

3.    The second contracting party to receive a monthly salary of
    DM2000 (DM500 per each member of the band) Five Hundred
    German Marks........payable at the end of each month.

    (a) Free accommodation and meals given to the second
        contracting party DM...... will be deducted from the
        monthly salary.

    (b) Overtime is paid at the rate of 60 DM per hour (15 DM
        per each member of the band).

4.    For travelling costs the second contracting party will
    receive 660DM for a second class ticket and luggage (160 DM
    per each member of the band).

:WP1:M:135.215:JH7531P

2

5.    The contracting parties make this contract according to the
      regulations of Trade Union Agreement.

6.    Holiday according to the Trade Union Agreement will be
      determined as follows.....

7.    Smoking and drinking is not allowed on stage.

8.    The second contracting party is not to appear on stage of
      similar events during the duration of the contract without
      the prior written permission of the first contracting party.
      (For the duration of the contract).

9.    (a) The party in breach of this contract has to pay
          contractual damages to the amount of half a monthly
          salary.  Further damages are not excluded.

      (b) If the second contracting party is in breach he shall
          also be obliged to repay damages to the musical
          director.

10.   Jurisdiction for all disputes arising from this contract:
      Hamburg.

11.   Special conditions: It is agreed that the band will not
      perform or accept other engagements in Germany from the date
      of this contract until the contract becomes effective.

12.   Signatures of the contracting parties.

:WP1:M:135.215:JH7531P

3

# EXHIBIT  D

AN AGREEMENT made the (4th) day of June 1962

BETWEEN THE PARLOPHONE COMPANY LIMITED of Hayes in the County

of Middlesex (hereinafter called "the Company") of the one part and

BRIAN EPSTEIN, c/o N.E.M.S. Ltd., 12-14, Whitechapel, Liverpool 1.,

(hereinafter called "the Manager") of the other part.

WHEREAS the Manager:-

    i. has under his control a group of Instrumentalists professionally

    known as THE BEATLES (hereinafter called "the Artists").

    ii. Acts herein on behalf of the Artists.

    iii. has represented to the Company that he is in a position to

    ensure the carrying into effect of the terms and conditions

    of the Agreement following:-

NOW IT IS HEREBY AGREED as follows:-

1. FOR the purpose of this Agreement the word "record" shall mean

a gramophone record, magnetic tape or any other sound-bearing contrivance

or appliance reproducing a performance by the Artists under this Agreement.

2. THE MANAGER shall procure that

    i. the Artists shall during a period of 1 (One) year computed

    from the 6th day of June 1962 attend at such places and

    times reasonably convenient to the Artists as the Company

    shall require and shall render such performances (whether

    alone or together with one or more other Artists) as the

    Company shall elect for reproduction in by or on any record.

    The minimum number of performances shall be sufficient to

    comprise not less than the equivalent of 6 (six) sides of

    a gramophone record manufactured to play at seventy-eight

    revolutions per minute (hereinafter referred to as "78 r.p.m."

    ii. The Artists shall at the request of the Company repeat any

    performance for the purpose of producing in the opinion of

    the Company a perfect record.

3. THE MANAGER undertakes that Artists shall not:-

    (a) during the currency of this Agreement render any

    performance whatsoever, and

4

(b) for the period of ten years immediately following
the termination of this Agreement or any extension
thereof perform any work recorded by the Company
under this Agreement

for any person firm or corporation other than the Company whereby
their performance might be recorded in any form from which any gramophone
record magnetic tape or any other sound-bearing contrivance or appliance
may be offered to the public.

4.   SUBJECT as hereinafter mentioned the Manager shall be entitled
to a royalty in respect of each record sold by the Company and any
person firm or corporation authorised by it after deducting fifteen
per cent (to cover records returned and/or damaged in transit and/or
used for demonstration or advertising purposes) as follows:-

(a) On a gramophone record manufactured to play at 78 r.p.m.
reproducing -

(i) On both sides performance by the Artists alone
1d (one penny) per record.

(ii) On both sides performance by the Artists together
with other Artists a proportion of 1d (one penny)
per record according to the number of other
Artists.

In the case of such a gramophone record only one side of
which reproduces the Artists' performance as aforesaid,
the amount of royalty shall be one-half of the amounts
set forth above.

(b) In the case of any other record the same shall be
deemed to consist of sections, each section comprising
a double-sided 78 r.p.m. gramophone record or the
equivalent thereof and royalty shall be calculated as
above on each such section reproducing the Artists'
performance.

(c) The royalty rates mentioned above shall apply only to
sales in the United Kingdom; on sales in territories
outside the United Kingdom the rates shall be one-half
of those set forth in (a) and (b) above.

5.

Royalty as above shall be payable during the currency of this Agreement and thereafter during the life of the Manager or for 25 years from the date hereof whichever is the longer.

5.   NOTWITHSTANDING the provisions of Clause 4 hereof, should the Artists perform in breach of the provisions of Clause 3 hereof then without prejudice to the Company's rights in respect of such breach the Manager shall immediately cease to be entitled to royalty on sales thereafter of any records.

6.   THE Company shall deduct from royalty payments all amounts as are demanded from the Company in respect of such payments by the Governments of the respective countries in which records are sold.

7.   NOTWITHSTANDING anything herein contained the Company's obligation hereunder to pay royalty shall be limited in respect of sales of records in countries where currency restrictions are enforced to the amount of such royalty as the Company receives from its distributors in those countries.

8.   THE Company shall furnish to the Manager quarterly a statement showing the number of records sold during such quarterly period after making the deductions aforesaid and the amount of royalty due in respect thereof and subject to the Provisions of Clause 5 hereof the Company shall thereupon pay such amount to the Manager and such payment shall be a complete discharge of the Company's liability to make any payments hereunder.

9.   THE Company shall be entitled to the sole right of production, reproduction, sale (under such Trademarks as it may select), use and performance (including broadcasting throughout the world by any and every means whatsoever) of records manufactured in pursuance of this Agreement.

10.  THE Company shall at all times have the right at its discretion to decide whether and/or when to commence or discontinue or re-commence the said production, reproduction, sale, use and performance of records manufactured in pursuance of this Agreement, and the irrevocable right and licence to use and publish the Artists' names and photographs for labelling cataloguing and exploiting the said records AND to authorise any other person firm or corporation to do any or all such acts and things.

6

11.  THE Company shall be entitled to continue this Agreement for 3 (three) successive periods of 1 (one) year each upon giving notice in writing to the Manager. Any notice given under the provisions hereof shall be given before the expiration of this Agreement by registered letter and sent to the address of the Manager last known to the Company. The said notice shall be deemed to have been received by the addressee upon the day on which it would have been received in the course of normal post. Should this Agreement be extended for a further first period of one year then in respect of records reproducing performances recorded by the Artists during such first extended period the royalty referred to on Cl. 4(a) hereof shall be increased to 1¼d. (one penny farthing). In the case of any further extension then in respect of records reproducing performances recorded by the Artists during such further extension the said royalty shall be increased to 1½d (three half pence).

12.  THIS Agreement shall be governed by English Law and the High Court of Justice in England shall be the Court of Jurisdiction.

IN WITNESS whereof THOMAS HUMPHREY TILLING on behalf of the Company and BRIAN EPSTEIN have hereunto set their hands the day and year first above mentioned.

SIGNED by the said
THOMAS HUMPHREY TILLING
in the presence of:-

SIGNED by the said
BRIAN EPSTEIN
in the presence of:-

Brian Epstein

T. Wooler

7

# EXHIBIT  E

1

**SUBJECT TO CONFIDENTIALITY SPECULATION AND PROTECTIVE ORDER**

2

3

4

5

6
UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
7
---------------------------------------------x
8

9
APPLE CORPS LIMITED AND APPLE RECORDS INC   : 91 Civ.7465(CSH)

10
                                   Plaintiffs   :

11                                              :

                     - against -
12                                              :

13
SONY MUSIC ENTERTAINMENT INC, LEE HALPERN,   :
LAWRENCE HALPERN and MICHAEL HALPERN
14                                              :

15
                                   Defendants

16
---------------------------------------------x

17

18                          - - - - - - -

19                        Deposition of
                         GEORGE HARRISON
20             taken at Euro Atlantic Limited,
          26 Cadogan Square, London SW1, England,
21              on Friday, 10th, July 1992

22                          - - - - - - -

23

24

25

26

HARRY COUNSELL & CO. Court Reporters,
61. Carey Street, London WC2A 2JG, England.
Telephone No: 01-242 9346.
Telecopy 01-831 2526

46 of 100

CONFIDENTIAL

HARRISON - LEVY

1
2  Q.  In 1962 did you ever perform at the Star Club with The
3      Beatles?
4  A.  Yes.
5  Q.  Do you recall playing there in December 1962?
6  A.  Not specifically, no.
7  Q.  Do you ever recall playing when Kingsize Taylor and
8      the Dominoes were also on the bill?
9  A.  I don't recall it, no, but it's likely.
10 Q.  At the time that you played at the Star Club, do you
11     ever recall anyone making a tape of performances?
12 A.  No.
13 Q.  When I say "performances" not necessarily yours but
14     any other group's performances.
15 A.  No.
16 Q.  Do you recall Mr Taylor ever asking you for permission
17     to tape your performances?
18 A.  No.
19 Q.  Do you recall in 1963 ever discussing the tapes of The
20     Beatles performances at the Star Club with Adrian
21     Barber?
22 A.  No.
23 Q.  I show you a document which has been previously marked
24     as Exhibit 51 dated May 9th 1963.  (Handed)  Have you
25     ever seen this one before?
26 A.  No, it's good though.

22

HARRY COUNSELL & CO. Court Reporters.
61. Carey Street. London WC2A 2JG. England.
Telephone No: 01-242 9346.
Telecopy 01-831 2526

47 of 100

CONFIDENTIAL

HARRISON – HAYES

1

2    They would play an hour, we would play an hour, they

3    would play an hour and we would play an hour, and it

4    just went on like that.

5    Q.   At that time do you recall any recordings being made,

6         any tapes being made, of any performances of any

7         artists?

8    A.   No.

9    Q.   And do you recall, sir, with certainty that no such

10        tapes were ever made or you simply don't recall one

11        way or the other?

12   A.   We were in Germany on various occasions probably for a

13        total of 12 months and I never saw a tape machine ever

14        or microphones or anything.  The only microphones that

15        were ever there were the vocal mikes to sing on.

16        There was never any indication or permission given or

17        even anybody asking us, as far as my recollection

18        goes.

19   Q.   I want to try to come to understand the best of your

20        recollection. Are you pretty certain that that is the

21        case or is that simply a belief that you have?

22   A.   That is how it was for me.  We were there to play.  We

23        were not there to record.  No request had ever been

24        made to record and no permission was granted.

25   Q.   In the early seventies when you had this conversation

26        with Mr Williams concerning the tapes, do you recall

44

HARRY COUNSELL & CO, Court Reporters,
61. Carey Street, London WC2A 2JG, England.
Telephone No: 01-242 9346.
Telecopy 01-831 2526

48 of 100

1   <u>SUBJECT TO CONFIDENTIALITY SPECULATION AND PROTECTIVE ORDER</u>

2

3

4

5   UNITED STATES DISTRICT COURT

6   SOUTHERN DISTRICT OF NEW YORK

7   -------------------------------------------x

8

9   APPLE CORPS LIMITED AND APPLE RECORDS INC    : 91 Civ.7465(CSH)

    Plaintiffs    :

10                                                :

11        - against                               :

12                                                :

13  SONY MUSIC ENTERTAINMENT INC, LEE HALPERN,    :
    LAWRENCE HALPERN and MICHAEL HALPERN
                                                  :
14             Defendants

15  -------------------------------------------x

16

17             - - - - - - -

18             Deposition of
               JAMES PAUL McCARTNEY
19       taken at Mr McCartney's Music Studios,
                 East Sussex, England
20           on Thursday, 9th July 1992

21             - - - - - - -

22

23

24

25

26

HARRY COUNSELL & CO, Court Reporters,
61, Carey Street, London WC2A 2JG, England.

50 of 100

CONFIDENTIAL

McCARTNEY - HAYES

1
2    A.    No.

3    Q.    And sitting here today you're pretty sure it never

4          happened or simply don't know?

5    A.    I'm not sure at all, but I don't recall a meeting with

6          Allan, but I'm not sure.

7    Q.    Go back just a moment to 1962 and the Star Club, is it

8          correct that you don't recall having any conversation

9          with Adrian Barber concerning recording a performance?

10   A.    That is correct.

11   Q.    Indeed, you have no recollection of any recording - at

12         that time of any recording being done of any

13         performances at all, correct?

14   A.    That is true.

15   Q.    Now, do you recall meeting with Mr Taylor at some

16         point in the seventies about the Hamburg tapes?

17   A.    No.

18   Q.    Do you recall an offer being made some time in the

19         area of 1973 or 1974 to give The Beatles a 25% share

20         of any sums received from exploiting the Hamburg

21         tapes?

22   A.    No.

23   Q.    In fact, it would be accurate to say, would it not,

24         and as you testified, your sole recollection of this

25         matter, in effect, jumps from the Brian Epstein

26

66

2

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3

4        ─────────────────────────────── )

5    APPLE CORPS LIMITED, and APPLE        )
     RECORDS, INC.,                        )
6                                          )
                      Plaintiffs,          )
7                                          )
                 vs.                       )  No. 91 Civ. 7465(CSH)
8                                          )
     SONY MUSIC ENTERTAINMENT, INC.,       )
9    LEE HALPERN, LAWRENCE HALPERN,        )
     MICHAEL HALPERN, and DOUBLE H         )
10   LICENSING CORPORATION,                )
                                           )
11                    Defendants.          )
         ─────────────────────────────── )
12

13

14

15                   C O N F I D E N T I A L

16

17        Deposition of RINGO STARR, taken on

18        behalf of Defendant Sony Music

19        Entertainment, Inc., at 2029 Century

20        Park East, Suite 460, Los Angeles,

21        California, commencing at 12:35 P.M.,

22        on Wednesday, September 9, 1992,

23        before Lisa Trani, CSR #6039, pursuant

24        to Notice.

25

11

1        A.    No.

2        Q.    Do you recall whether his group appeared at

3    the Star Club?

4        A.    I feel they did, yes.

5        Q.    When you appeared at the Star Club in 1962,

6    do you recall whether the Beatles would be the only act

7    on the bill or whether there would be other acts?

8        A.    Other acts.

9        Q.    And would it be accurate to say that you

10   would do a set and then the other act or acts would do a

11   set of their own?

12       A.    Sure.

13       Q.    Do you recall whether any of the

14   performances at the Star Club were taped?

15       A.    I don't remember any of them being taped at

16   that time.

17       Q.    Is it that you don't recall one way or the

18   other or you have a clear recollection that they were not

19   taped?

20       A.    As far as I can recall, no, there was no

21   taping, no tape made of the performances in the Star

22   Club.

23       Q.    Do you recall whether you ever discussed

24   with Mr. Taylor a question of whether tapes should be

25   made of any performances?

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

APPLE CORPS LIMITED, and APPLE          :
RECORDS, INC.,
                                        :
                                             91 Civ. 7465 (CSH)
                                        :
               Plaintiffs,              :    CONSENT ORDER
                                             AND ORDER OF
             -against-                  :    DISCONTINUANCE

SONY MUSIC ENTERTAINMENT, INC., LEE     :
HALPERN, LAWRENCE HALPERN,
MICHAEL HALPERN, and DOUBLE H           :
LICENSING CORPORATION,
                                        :
               Defendants.              :

----------------------------------------x

        WHEREAS, on or about October 16, 1991, Apple Corps Ltd.

and Apple Records, Inc. ("Apple" or "plaintiffs") commenced an

action against Sony Music Entertainment, Inc. ("Sony") and Lee

Halpern, Larry Halpern and Michael Halpern in the Supreme Court

of the State of New York, New York County, Index. No. 28363/91,

which was removed by defendants on or about November 4, 1991 to

the federal district court of the Southern District of New York,

No. 91 Civ. 7465 (CSH) (the "Action");

        WHEREAS, Double H Licensing Corporation was added as a

defendant in the Action (Lee Halpern, Larry Halpern, Michael

Halpern and Double H Licensing Corporation are hereinafter

referred to as the "Halpern defendants");

        WHEREAS, plaintiffs brought this action against

defendants seeking money damages and permanent injunctive relief

on the alleged basis, <u>inter alia</u>, that plaintiffs had not authorized the licensing, manufacture, distribution or sale of certain Records[1] derived from audio tapes of a live performance by the Beatles in 1962 at the Star Club in Hamburg, Germany (the "Beatles Masters") or the use of the Beatles' names and likenesses in connection with the Beatles Masters and Records derived therefrom;

WHEREAS, on or about November 27, 1991, defendants answered the complaint in the Action, denying the material allegations thereof and asserting various affirmative defenses of, <u>inter alia</u>, laches, estoppel, waiver and acquiescence;

WHEREAS, the Halpern defendants purport that they own full rights, title and interest to the Beatles Masters, subject only to an agreement dated July 1, 1991 between Sony and Larry Halpern and Michael Halpern (the "Halpern/Sony Agreement");

WHEREAS, while defendants do not concede that they failed to obtain proper authorization to license, manufacture, distribute and sell such Beatles Masters and Records derived therefrom or to use the Beatles' names and likenesses in connection therewith, or the merit of any of the claims asserted in plaintiffs' pleading, and plaintiffs do not concede the merit of any defense raised by defendants or any lack of merit to their

---

[1] As used herein, the term "Records" means all forms of reproductions of sound, whether or not accompanied by visual images, in any form or medium now known or hereafter devised, including but not limited to tape cassettes and compact discs.

-2-

affirmative claims, and for the sole purpose of settling disputed claims and defenses in this action, and to avoid the expenses and uncertainties of litigation, the parties have consented to the issuance of this Order;

NOW, THEREFORE, the parties hereto are ordered as follows:

A.   The defendants and each of them, and all persons in active concert with them, permanently shall not, directly or indirectly, (i) reproduce, manufacture, press, copy, release, distribute, sell, market, license or otherwise dispose of or exploit in any manner the Beatles Masters and Records derived therefrom, or (ii) use the Beatles' names or likenesses for any purpose in connection with the Beatles Masters and Records derived therefrom;

B.   Within ten days of the entry of this Order, the Halpern defendants shall surrender and transfer to plaintiffs' counsel, Gold, Farrell & Marks, any and all masters which contain in whole or in part the Beatles Masters, including but not limited to all tapes, acetates, stampers, mothers, films or duplicates thereof and any other items used in the licensing or manufacturing of the Beatles Masters or Records derived therefrom or the printing of associated packaging or other materials and Sony shall surrender and transfer to plaintiffs any and all masters and other materials supplied to it by the Halpern defendants pursuant to the Sony/Halpern Agreement;

-3-

C.   Within ten days of the entry of this Order, defendant Lee Halpern shall execute and deliver to plaintiffs' counsel, Gold, Farrell & Marks, an affidavit in the form annexed hereto as Exhibit A;

D.   Except for the masters and other materials surrendered to plaintiffs' counsel pursuant to paragraph B, supra, Sony and all companies affiliated with Sony shall within twenty days of the entry of this Order destroy 1) all Beatles Masters and Records derived therefrom in its custody, possession or control; 2) all parts in its possession by which such Beatles Masters and Records derived therefrom were reproduced, manufactured, distributed and sold, including but not limited to master recordings, tapes, acetates, stampers, mothers, films or duplicates thereof and any other items used in the manufacture, distribution or sale of the Records or printing of associated packaging or other materials; and thereafter shall promptly ndestroy any additional Records which are returned to it;

E.   Within twenty days of the entry of this Order, Sony through one of its officers shall execute and deliver to plaintiffs' counsel Gold, Farrell & Marks an affidavit in the form annexed hereto as Exhibit B;

F.   Hereafter any and all of defendants' purported right, title and interest in and to the Beatles Masters and the performances contained thereon are transferred to plaintiff Apple Corps Limited;

-4-

G.   The Halpern defendants represent that except for the Sony License of July 1, 1991 there are no outstanding licenses or grants of right in or to the Beatles Masters;

H.   Sony represents that neither it nor any of its affiliated companies have licensed any right to, or use of, the Beatles Masters and Records derived therefrom to any entity which is not an affiliated company of Sony;

I.   The parties shall bear their own costs, attorneys fees and expenses;

J.   Plaintiffs, and plaintiff Apple Corps Limited's shareholders, Paul McCartney, George Harrison, Richard Starkey and the Estate of John Lennon, for themselves, their heirs, assignees and successors in interest, hereby release, acquit and forever discharge Sony, the Halpern defendants, their agents, directors, officers, employees, successors, assigns, licensees, distributors, contractors, and any persons, companies, corporations or entities acting on their behalf (the "Defendant Releasees") of and from any and all claims, causes of action in law, or equity, suits, debts, liens, promises, demands, liabilities, damages, losses, costs or expenses of any nature whatsoever whether presently known or unknown, fixed or contingent which they have, or ever had, against the Defendant Releasees or any of them by reason of any matter, causes or events arising or existing as of the date of this Order relating to the commercial exploitation of the Beatles Masters and Records

-5-

derived therefrom; _provided_ however that nothing in this
paragraph releases any Defendant Releasee from the effect of any
order of any court entered prior to this date;

K.    Defendants, their heirs, assignees and successors
in interest, hereby release and forever discharge the Plaintiffs,
their shareholders, agents, directors, officers, employees,
successors, assigns, licensees, distributors, contractors, and
any persons, companies or entities acting on their behalf (the
"Plaintiff Releasees") of and from any and all claims, causes of
action in law, or equity, suits, debts, liens, demands,
liabilities, damages, losses, costs or expenses of any nature
whatsoever whether presently known or unknown, fixed or
contingent which they have, or ever had, against the Plaintiff
Releasees or any of them by reason of any matter, causes or
events arising or existing as of the date of this Order relating
to the commercial exploitation of the Beatles Masters and Records
derived therefrom;

-6-

ORDERED, that subject to the terms provided for herein this action is hereby discontinued, with prejudice.

Dated:  New York, New York
        July  30 , 1993

SONY MUSIC ENTERTAINMENT, INC.          APPLE CORPS LIMITED AND
                                        APPLE RECORDS, INC.


Steven M. Hayes (SH  2926   )          Paul V. LiCalsi (PL 6644)
Parcher & Hayes, P.C.                   Gold, Farrell & Marks
500 Fifth Avenue                        41 Madison Avenue
New York, New York  10110               New York, NY  10010


LEE HALPERN, LAWRENCE HALPERN
MICHAEL HALPERN and DOUBLE H
LICENSING CORPORATION


Stewart L. Levy  (SL 2873  )
Eisenberg Tanchum & Levy
477 Madison Avenue
New York, New York  10022


                                        So Ordered:

                                        _____
                                        United States District Judge


                             -7-

# EXHIBIT  G



IN THE HIGH COURT OF JUSTICE                              CH 1996 H No. 3983
CHANCERY DIVISION

Before Mr Justice Neuberger
Friday 8 May 1998

B E T W E E N:

1. **GEORGE HARRISON**
2. **JAMES PAUL McCARTNEY**
3. **RICHARD STARKEY**
4. **YOKO ONO LENNON** (as executrix of the will of JOHN WINSTON ONO LENNON)

                                                              Plaintiffs

-and-

**LINGASONG MUSIC LIMITED**

                                                              Defendant

─────────────────────────

~~MINUTES OF~~ ORDER

─────────────────────────

UPON the trial of this action

AND UPON hearing oral evidence

AND UPON hearing Counsel for the Plaintiffs and Counsel for the Defendant

AND UPON the Defendant by its Counsel (i) conceding that it has, without the requisite consent of the Plaintiffs or John Winston Ono Lennon or any of them, procured the manufacture of all LING 95 and LING 96 CDs and that it has, without such consent, issued to the public all those which have been sold, and that in doing so it has infringed the Plaintiffs' performer's rights, and (ii) abandoning its defences in the first two sentences of paragraph 12 of the Amended Defence

1

'020 7919 4919        2/1/01 5:46  PAGE  3/12    RightFAX
To:  MS A LIPPMAN  Company:  G KANGIS

AND UPON the Plaintiffs by their Counsel agreeing that the issue of additional damages is
to be left to the inquiry as to damages and that they will not rely, in support of their claim
for additional damages, upon the abandonment of defences relating to the Defendant's state
of mind

IT IS HEREBY DECLARED THAT:

1.      The Plaintiffs and each of them are entitled to performer's rights (including
reproduction and distribution rights) in a performance or performances given by the Beatles
at the Star Club in Hamburg in about 1962.

2.      No consent was given by any of the Plaintiffs (or by John Winston Ono Lennon) to
the making of recordings of the said performance or performances or to the making, selling,
distributing or issuing to the public of copies of such recordings.

3.      The Defendant has infringed the Plaintiffs' performer's rights (including reproduction
and distribution rights) by making, selling, distributing and issuing to the public copies of
recordings of the said performance or performances and/or by authorising and/or procuring
others to do so.

AND IT IS ORDERED THAT:

1       The Defendant be restrained from doing (whether acting by its directors officers
servants or agents or any of them or otherwise howsoever) the following acts or any of them
that is to say infringing any of the performer's rights (including reproduction and/or
distribution rights) of the Plaintiffs or any of them in the said performance or performances,
or procuring others to do so.

2       The Defendant do on or before 29 May 1998 deliver up to the Plaintiffs' solicitors for
forfeiture to the Plaintiffs all illicit recordings in the Defendant's possession power custody
or control and make (by a proper officer) and serve upon the Plaintiffs' solicitors an affidavit
verifying that such delivery up has been completed. "Illicit recordings" includes, without
limitation, the original reel to reel tape recording of the said performance or performances and

2

the master tape thereof, together with all other recordings made directly or indirectly from any of the above.

3.    The Defendant do on or before 29 May 1998 make (by a proper officer) and serve upon the Plaintiffs' solicitors an affidavit, exhibiting all relevant documents, disclosing full details of the Defendant's dealings in illicit recordings, including without limitation:

(a) full details of all sales, supplies and offers for sale or supply by the Defendant of recordings of the said performance or performances, including the identities and addresses of the persons firms or companies to whom such sales, supplies or offers were made and the dates and quantities thereof and identifying the particular recordings in question;

(b) full details of all sales, supplies and offers for sale or supply of such recordings to the Defendant, including the identities and addresses of the persons firms or companies by whom such sales, supplies or offers were made and the dates and quantities thereof and identifying the particular recordings in question;

(c) full details of all instances of the making of such recordings by, for or with the authority of the Defendant (whether recordings made for commercial sale or recordings made for the purpose of making further recordings or otherwise), including the identities and addresses of the persons firms or companies by whom such recordings were made and the dates and quantities thereof and identifying the particular recordings in question and the identities and addresses of any persons firms or companies who caused, procured, assisted or enabled others to make such recordings.

4.    The following inquiry be made that is to say an inquiry as to what damages the Plaintiffs have suffered by reason of the Defendant's infringements of their performers' rights and as to what if any additional damages for such infringements should be awarded.

5.    The Defendant do pay to the Plaintiffs all sums found to be due to them upon making such inquiry together with interest thereon pursuant to section 35A of the Supreme Court Act

3

1981 to be assessed.

6.    The Defendant do pay to the Plaintiffs their costs of this action down to and including the date of this Order. The Plaintiffs be at liberty to apply for an assessment of costs and/or as to the basis thereof provided that they give notice of their application on or before 22 May 1998.

7.    The monies paid into Court by the Defendant pursuant to the order of Mr Justice Neuberger dated 1 November 1996 (together with the interest thereon) be paid out to the Plaintiffs.

8.    The Plaintiffs be at liberty to apply on 2 clear days' notice for directions as to the conduct of the said inquiry.

9.    The costs of the said inquiry be reserved.

4

CH 1996 H No.

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION

Before Mr Justice Neuberger
Friday 8 May 1998

B E T W E E N:

1. GEORGE HARRISON
2. JAMES PAUL McCARTNEY
3. RICHARD STARKEY
4. YOKO ONO LENNON (as executrix of the will
of JOHN WINSTON ONO LENNON)

Plaintiffs

-and-

LINGASONG MUSIC LIMITED

Defendant

_____

~~MINUTES OF~~ ORDER

_____

FRERE CHOLMELEY BISCHOFF
4 John Carpenter Street
London EC4Y 0NH

Ref NFV/SRL/NC

020 7919 4919        2/1/01 5:46  PAGE   7/12    RightFAX
TO:  MS. A LIPPMAN  Company:  G KANGIS
yd 04/20 10:40AM (03:06) on Fax Server Line 04 for RIGHTFAXUS  WORKSRV6 printed RIG38FEDF671364 on 04/20/2000 10:44AM • Pg 2/7
   20/04 '00  10:29  ☎                                                        ⌀002

IN THE HIGH COURT OF JUSTICE                 CH 1996 H No: 3983
CHANCERY DIVISION

                                      Royal Courts of Justice,
                                         The Strand, London

                                      Friday, 8th May 1998


                              Before:
                     MR JUSTICE NEUBERGER

           ------------------------------

B E T W E E N:

                   (1)     GEORGE HARRISON
                   (2)  JAMES PAUL McCARTNEY
                   (3)     RICHARD STARKEY
                   (4)     YOKO ONO LENNON
                (as executrix of the will of
            JOHN WINSTON ONO LENNON, (deceased)
                                                        Plaintiffs


                                and


                   LINGASONG MUSIC LIMITED
                                                    Defendant

           ---------------------------

MR    MARK PLATTS-MILLS QC and MR MICHAEL TAPPIN (Instructed by
      Messrs Frere Cholmeley Bischoff, London) appeared on
      behalf of the Plaintiffs.

MR    NICHOLAS MERRIMAN QC and MR PAUL DICKENS (Instructed by
      Messrs Kanaar & Co, London) appeared on behalf of the
      Defendant.

           -------------------------------------
                   Computer-Aided Transcript by
                        Harry Counsell & Co,
                   61 Carey Street, London WC2A 2JG
                        Tel: 0171-242-9346

           ------------------------------


                   J U D G M E N T
                (As Approved by the Judge)



                              1

. 020 7919 4919        2/1/01 5:46  PAGE  8/12    RightFAX
··To:  MS,A LIPPMAN  Company:  G KANGIS
Rvd 04/20 10:40AM (03:06) on Fax Server line 04 for RIGHTFAXUS  WORKSRV6 printed RIG38FEDF671364 on 04/20/2000 10:44AM • Pg 3/7
    20/04 '00  10:29  ☎                                            ☑003

1    MR    JUSTICE NEUBERGER:  The Plaintiffs are the three surviving

2          members of The Beatles, George Harrison, Paul McCartney,

3          Richard Starkey (known as Ringo Starr), and the widow and

4          executrix of the will of John Lennon, Yoko Ono Lennon.

5              The Plaintiffs' claim arises out of a recording made

6          of The Beatles' performances in December 1962 at the Star

7          Club in Hamburg.    The performances took place at a

8          Christmas Eve party and a New Year's party at the club.

9              The claim is for infringement of performance rights.

10         The present case has been before me for three days, during

11         which I heard direct evidence from one of the four

12         Plaintiffs, George Harrison, and one or two other

13         witnesses on behalf of the Plaintiffs; on behalf of the

14         Defendant I heard evidence in some detail from Mr Taylor,

15         who was the person who retained the original recording and

16         who may have been responsible for making it.  He is the

17         person who received the alleged consent from the

18         Plaintiffs, on which the Defendant relied.

19             This morning I was told that the Defendant, Lingasong

20         Music Limited, had withdrawn its defence to the effect

21         that the Plaintiffs had consented to the recording being

22         made and used  and that that consent extended to the

23         recording being issued in the form of CDs.  It is

24         therefore effectively conceded by the Defendant that it

25         has either infringed the Plaintiffs' performance,

26         reproduction and distribution rights, or has procured

27         others to do so.

28             The Defendant is content to submit to an injunction,

29         declarations, an order for disclosure, an inquiry as to

30         damages and an order for costs.  The Plaintiffs

                                    2

.020 7919 4919        2/1/01 5:46 PAGE 9/12    RightFAX
'To: MS A LIPPMAN Company: G KANGIS
LvS 04/cu 10:40AM (03:06) on Fax Server line 04 for RIGHTFAXUS  WORKSRV6 printed RIG38FEDF671364 on 04/20/2000 10:44AM * Pg 4/7
20/04 '00 10:30   ☎                                    ⓩ004

1   specifically want declaratory relief to the effect that

2   (1) the Plaintiffs are entitled to performer's rights,

3   including reproduction and distribution rights in the said

4   performances, (2)  no consent was given by any of the

5   first three Plaintiffs, or by John Lennon, to the making

6   of the recordings of the said performances, or to the

7   making, selling, distributing or issuing to the public of

8   copies of such recordings;  and (3) the Defendant has

9   infringed the Plaintiffs' performance rights, including

10  reproduction and distribution rights by making, selling,

11  distributing and issuing to the public copies of

12  recordings of the said performances, and/or by authorising

13  and/or procuring others to do so.

14      A declaration cannot be granted by consent and it is,

15  therefore, necessary for me to consider whether, although

16  Mr Merriman, who appears on behalf of the Defendant, does

17  not oppose, I ought to make the declarations sought.

18      I have heard the bulk of the evidence, and in

19  particular the evidence from two people who (since the

20  death of Mr Lennon) are most directly involved in the

21  matter, namely Mr Harrison and Mr Taylor, in full.  I am

22  as clear as I could possibly be, that the three

23  declarations are declarations to which the Plaintiffs are

24  entitled.  It is inappropriate for me to go into the

25  matter in much detail.  I found the evidence of Mr

26  Harrison convincing.  The evidence of Mr Taylor, while

27  there is no suggestion of his intentionally misleading the

28  court, was confused and inconsistent with sworn statements

29  he had made earlier in a deposition and in an affidavit.

30  It was also clear from his evidence that he had a poor

3

. 020 7919 4919         2/1/01 5:46  PAGE 10/12    RightFAX
.. To:  MS. A LIPPMAN   Company:  G KANGIS
.:vd 04/20 10:40AM (03:06) on Fax Server line 04 for RIGHTFAXUS  WORKSRV6 printed RIG38FEDF671364 on 04/20/2000 10:44AM * Pg 5/7
. . 20/04 '00 10:30   ☎                                                                    @005

```
 1  |  memory of things generally.
 2  |      I have no hesitation in holding (1) that the words,
 3  |  allegedly used by the late Mr Lennon to Mr Taylor, relied
 4  |  on by the Defendant as giving consent to the use of the
 5  |  recording, were not used and (2) that, if they had been
 6  |  used, they were quite insufficient to transfer on behalf
 7  |  of Mr Lennon, let alone on behalf of Mr Harrison, Mr
 8  |  McCartney and Mr Starkey, the consent which the Defendant
 9  |  would have had to establish.  As to the first point, I am
10  |  not satisfied that any consent was given by Mr Lennon;  Mr
11  |  Taylor's evidence provides an insufficient basis, in my
12  |  assessment, to support that contention, particularly
13  |  bearing in mind the circumstances, namely the end of a
14  |  long and convivial night.  Even if the words relied on by
15  |  the Defendant were used, I do not think that they would
16  |  have meant anything other than that Mr Taylor could keep
17  |  the tape.  Given that it contained recordings of his band
18  |  as well as those of the Beatles, that would scarcely be
19  |  surprising.  I do not consider that, even if Mr Taylor is
20  |  correct, he was given (or understood that he was given)
21  |  any right to reproduce the recordings for gain, let alone
22  |  to pass on any right to third parties, particularly in
23  |  relation to CDs, which did not exist in 1962.  As if that
24  |  were not enough, even if any consent was given by Mr
25  |  Lennon, I do not consider that he had the authority, or
26  |  the consent (whether tacit or otherwise), of any of the
27  |  first three plaintiffs to give consent on their respective
28  |  behalves.
29  |      It is true that in a judgment in 1977 Sir Robert
30  |  Megarry, Vice-Chancellor, made reference to the fact that
```

4

020 7919 4919        2/1/01 5:46  PAGE 11/12    RightFAX
•·To:  MS A LIPPMAN   Company:  G KANGIS
04/20 10:40AM (03:06) on Fax Server line 04 for RIGHTFAXUS  WORKSRV6 printed R1G38FEDF671364 on 04/20/2000 10:44AM * Pg 6/7
20/04  '00  10:31    ☎                                        @008

```
 1    it was common ground that oral consent had been given.

 2    However, (a) that suggested oral consent did not amount to

 3    reproducing the tapes in any form, let alone in CD form by

 4    third parties for commercial gain and (b) in any event, on

 5    the evidence I have seen, I am satisfied that, in so far

 6    as it was common ground, it was merely a common assumption

 7    for the purpose of that interlocutory hearing and nothing

 8    more than that.

 9        In those circumstances, in light of the way in which

10    the evidence has come out, I think that the Defendant was

11    well advised to concede, and I have no hesitation in

12    saying that the Plaintiffs should have the declarations

13    that they seek.

14        So far as costs are concerned, I think it right (and

15    it is not disputed) that the Plaintiffs should have their

16    costs.  As to whether or not they should be entitled to a

17    lump sum order, that seems to me to be something I cannot

18    determine today.  Mr Merriman rightly says that it is

19    undesirable for the matter to be adjourned simply for that

20    question to be considered.  However, the Defendant, by

21    conceding the Plaintiffs' claim, has caught the Plaintiffs

22    on the hop with regard to preparing a bill of costs for

23    the Defendant and the court to consider.  In those

24    circumstances, subject to an appropriate time limit, I

25    think it right to grant the Plaintiffs the opportunity to

26    come back on the issue of assessment of costs.  There will

27    also be an order for an assessment of damages and the

28    issue of flagrancy can be decided then.

29        I do not understand it to be in dispute that the

30    small sum of money in court should be paid out to the
```

5

·020 /919 4919          2/1/01 5:46  PAGE 12/12    RightFAX
To:  MS A LIPPMAN   Company:  G KANGIS
20/04 '00 10:31   ☎  line 04 for RIGHTFAXUS  WORKSRV6 printed RIG38FEDF671364 on 04/20/2000 10:44AM  Pg 7/7
☎007

1          Plaintiffs' solicitors, together with interest.  Unless my

2          understanding is wrong, I propose so to order.

3                      ---------------------------

6

# EXHIBIT  H

P.O.  2641-94
nd
6/1/95
SUPERIOR COURT OF NEW JERSEY
BERGEN COUNTY - LAW DIVISION
MARCH       TERM A.D. 1994
THIRD       STATED SESSION

THE STATE OF NEW JERSEY :

      -vs-                :

JEFFREY COLLINS          :          Indictment No.

                         :          S 0692-95
                                    95-05-0692-I
                         :

      DEFENDANT          :

      The Grand Jurors of the State of New Jersey, for the
County of Bergen, upon their oaths present as a

                    FIRST COUNT
                   (Third Degree)

that JEFFREY COLLINS, on or about during and between October 4,
1994 to November 30, 1994, in the City of Englewood, in the
County of Bergen aforesaid, and within the jurisdiction of this
Court, with the purpose to obtain commercial advantage or private
financial gain, did knowingly advertise or offer for sale, resale
or rental, or did sell, resell, rent or transport a sound
recording or audiovisual work, the label, cover, box or jacket of
which did not clearly and conspicuously disclose the true name
and address of the manufacturer, and/or the name of the actual
performer or group, in a quantity of at least 1,000 unlawful
sound recordings or at least 65 audiovisual works within any 180
day period; contrary to the provisions of NJS 2C:21-21c(4), and
against the peace of this State, the Government and dignity of
the same.

SECOND COUNT
(Fourth Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do PRESENT that JEFFREY COLLINS, on or about during and between October 4, 1994 and November 30, 1994, in the City of Englewood, in the County of Bergen aforesaid, and within the jurisdiction of this Court, with purpose to defraud, did make, alter or utter any object, namely, cassette tapes and compact discs, in such a way that it appeared to have value because of antiquity, rarity, source or authorship, which it did not possess, contrary to the provisions of NJS 2C:21-2, and against the peace of this State, the Government and dignity of the same.

CHARLES R. BUCKLEY
DEPUTY ATTORNEY GENERAL-IN-CHARGE
ACTING BERGEN COUNTY PROSECUTOR

By:    Robert Holmsen
       Special Deputy Attorney General
       Acting Assistant Prosecutor

A True Bill

Alton Williams, Jr., Foreperson

0641-94

| State of New Jersey | New Jersey Superior Court |
| --- | --- |
| v. | Law Division - Criminal |

**DEFENDANT**
JEFFREY COLLINS
(Specify Complete Name)

☐ JUDGMENT OF CONVICTION
☐ CHANGE OF JUDGMENT
☐ ORDER FOR COMMITMENT
☐ INDICTMENT / ACCUSATION DISMISSED
☐ JUDGMENT OF ACQUITTAL

| DATE OF BIRTH | SBI NUMBER |
| --- | --- |
| 9/27/40 | 14995c |

| DATE OF ARREST | DATE INDICTMENT / ACCUSATION FILED 6/1/95 |
| --- | --- |
| 11/30/94 | |

| DATE OF ORIGINAL PLEA 7/17/95 | ORIGINAL PLEA ☐ NOT GUILTY ☐ GUILTY |
| --- | --- |

| ADJUDICATION BY | | |
| --- | --- | --- |
| ☐ GUILTY PLEA | DATE: 10/30/95 | ☐ NON-JURY TRIAL    DATE: |
| ☐ JURY TRIAL | DATE: | ☐ Dismissed/Acquitted    DATE: |

**ORIGINAL CHARGES**

| IND / ACC.NO | COUNT | DESCRIPTION | DEGREE | STATUTE |
| --- | --- | --- | --- | --- |
| 95-6-692I | 1 | PIRATING RECORDINGS | 3 | 2c:21-21c4 |
| | 2 | CRIMINAL SIMULATION | 4 | 2c:21-2 |

**FINAL CHARGES**

| COUNT | DESCRIPTION | DEGREE | STATUTE |
| --- | --- | --- | --- |
| 1 | | | |

It is, therefore, on  1/5/96  ORDERED and ADJUDGED that the defendant is sentenced as follows:

Ct.1 - Probation for 3 years.

Ct.2 - dismissed on State's motion.
State to return all legal recordings to the deft.

☐ It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.

| | | TOTAL NUMBER OF DAYS | DATE (From/To) |
| --- | --- | --- | --- |
| ☐ | Defendant is to receive credit for time spent in custody (R. 3:21-8). | | 11/30/94 |
| ☐ | Defendant is to receive gap time credit for time spent in custody. (N.J.S.A. 2C:44-5b(2)). | TOTAL NUMBER OF DAYS | DATE (From/To) |

Total Custodial Term _____   Institution _____   Total Probation Term _____

CP0188 (5/94)

*Administrative Office of the Courts
State Bureau of Identification
COPIES TO:  CHIEF PROBATION OFFICER    STATE POLICE    AOC CRIMINAL PRACTICE DIVISION    DEPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

02/15/2008 FRI 16:12  FAX 2013711118 criminal records rm 221                                    ☑005/005

COLLINS

State of New Jersey v.                                    S.B.I. #                    IND / ACC #

| | |
|---|---|
| Total FINE $ _____ | If any of the offenses occurred on or after July 9, 1987, or is for a violation of Chapter 35 or 36 of Title 2C. |
| Total RESTITUTION $ _____ | 1) A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for each count. (Write in $ lines for each.) |
| | ___ 1st Degree  @ $3000  ___ 4th Degree  @ $750 |
| If the offense occurred on or after December 23, 1991, an assessment of $50 is imposed on each count on which the defendant was convicted unless the box below indicates a higher assessment pursuant to N.J.S.A. 2C 43-3.1 (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.) | ___ 2nd Degree  @ $2000  ___ Disorderly Persons or Petty |
| | ___ 3rd Degree  @ $1000  ___ Disorderly Persons  @ $500 |
| | Total D.E.D.R. Penalty $ _____ |
| ☐ Assessment imposed on | ☐ Court further ORDERS that collection of the D.E.D.R. penalty be suspended upon |
| count(s) _____ | defendant's entry into a residential drug program for the term of the program. |
| is $ _____ each. | 2) A forensic laboratory fee of $50 per offense is ORDERED. ___ Offenses @ $50. |
| Total VCCB Assessment $   50 pay today | Total Lab Fee $ _____ |
| | 3) Name of Drugs Involved _____ |
| ☐ Installment payments are due at the rate of | 4) A mandatory driver's license suspension of ___ months is ORDERED. |
| $ _____ per _____ | The suspension shall begin today, _____ and end _____ |
| beginning _____ | Driver's License Number _____ |
| (DATE) | (IF THE COURT IS UNABLE TO COLLECT THE LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING.) |
| | Defendant's Address _____ |
| | Eye Color ___ Sex ___ Date of Birth ___ |
| | ☐ The defendant is the holder of an out-of-state driver's license from the following |
| | jurisdiction _____ Driver's License Number _____ |
| | ☐ Defendant's non-resident driving privileges are hereby revoked for ___ Months. |

If the offense occurred on or after February 1, 1993 and the sentence is to probation or to a State Correctional facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment payment is made. (P.L. 1992, c. 169).

If the offense occurred on or after August 2, 1993, a $75 Safe Neighborhood Services Fund assessment is ordered for each conviction. (P.L. 1993, c. 220)    $75 pay today

If the offense occurred on or after January 5, 1994 and the sentence is to probation, a fee of up to $25 per month for the probationary term is ordered. (P.L. 1993, c. 275) Amount per month  10 begins immediately

| NAME (Court Clerk or Person preparing this form) RICHPELCHER | TELEPHONE NUMBER | NAME (Attorney for Defendant at Sentencing) Sanford Kluger |
|---|---|---|

**STATEMENT OF REASONS**

Aggravating Factors:
   The need for deterring the deft. and others from violating the law.
Mitigating Factors:
   The Defts. conduct neither caused nor threatened serious harm, and he didn't contemplate it would.
   No history of crime, he has led law abiding life.
   Defts. character and attitude indicate he is unlikely to commit another offense.
   He is likely to respond well to probation.
Mitigating factors overwhelmingly outweigh the aggravating ones.
Court will honor plea agreement.

| JUDGE (Name) JOHN A. CONTE, J.S.C. | JUDGE (Signature) | DATE 1/11/96 |
|---|---|---|

Administrative Office of the Courts
State Bureau of Identification                                                    CPO188 (9/94)
COPIES TO:  CHIEF PROBATION OFFICER    STATE POLICE    ADC CRIMINAL PRACTICE DIVISION    DEPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

PAGE 5/5 * RCVD AT 2/15/2008 2:04:31 PM [Central Standard Time] * SVR:CHI2KRF01/2 * DNIS:4777 * CSID:2013711118 * DURATION (mm-ss):06-54

79 of 100

# EXHIBIT  I



GOLD, FARRELL & MARKS

ATTORNEYS AND COUNSELORS AT LAW

FORTY-ONE MADISON AVENUE

NEW YORK, N. Y. 10010-2201

(212) 481-1700

FACSIMILE (212) 481-1722

MARTIN R. GOLD
LEONARD M. MARKS
RAYMOND J. HESLIN
JANE G. STEVENS
PAUL V. LICALSI
ALAN R. FRIEDMAN
CHRISTINE LEPERA
CHARLES R. DICKEY
——————
ROBERT P. MULVEY
——————
JEANNIE COSTELLO
MARK N. DILLER
JENNIFER A. KRANE
MARK S. LAFAYETTE
AMY J. LIPPMAN
GILLIAN M. LUSINS
MICHAEL D. MANUELIAN
DEBRA A. MAYER
THOMAS P. McCAFFREY
L. LONDELL McMILLAN
CHARLES S. SULLIVAN
HOWARD H. WELLER
LINDA YASSKY

THOMAS R. FARRELL
COUNSEL

June 22, 1995

VIA FACSIMILE AND MAIL

Mr. Jeffrey Collins
Echo International
Disc-Tinct Music, Inc.
Dancefloor Distribution
95 Cedar Lane
Englewood, New Jersey  07631

Re:  "Jammin' with . . . The Beatles '62"

Dear Mr. Collins:

We represent Apple Corps Limited, the Apple
group of related companies, Messrs. George Harrison, Paul
McCartney and Richard Starkey and Ms. Yoko Ono Lennon, as
executrix of the Estate of John Lennon.  Our clients own
proprietary rights in and to the performances, name and
likeness of The Beatles.  It has come to our attention
that you, operating under the names of and/or in
conjunction with your companies named Echo International,
Disc-Tinct Music, Inc. and Dancefloor Distribution, are in
the process of manufacturing and preparing for
distribution and sale of an album entitled "Jammin' with .
. . The Beatles '62" (hereafter "The Unauthorized Album"),
which you purport consists of previously unreleased
recordings of The Beatles in performance at the Star Club
in Hamburg, Germany in 1962.

GOLD, FARRELL & MARKS

Mr. Jeffrey Collins
June 22, 1995
Page 2

Please be advised that our clients never authorized the recording of live performances of The Beatles at the Star Club and never granted anyone any rights to produce or sell recordings of such material. Moreover, our clients have not granted you, or anyone else, the right to use their name or likenesses or trademarks or tradenames in connection with such recordings.

Your actions in connection with The Unauthorized Album violate our clients' rights and are unlawful under federal and state law including, but not limited to, § 1101 of Title 17 of the United States Code, the Lanham Act, the New Jersey Anti-Piracy Act and common law rights of publicity and unfair competition. Accordingly, we hereby demand the following of you and any person or company with which you are affiliated: (1) that you immediately cease and desist from manufacturing, distributing or selling The Unauthorized Album and any other recordings embodying any performance of The Beatles, or taking any action in furtherance thereof; (2) that you deliver to us all materials you have used or intend to use for such purposes including, without limitation, all master tapes and master recordings embodying performances of The Beatles whether or not such masters are included on The Unauthorized Album; (3) that you deliver to us all copies of such recordings already manufactured which are in your possession; (4) that you pay over to our clients all revenues you have received with respect to such recordings; (5) that you provide us with all documentation of all contracts, licenses or other authorizations, if any, by which you claim any right to license the manufacture, distribute or sell The Unauthorized Album or other recordings embodying performances of The Beatles.

We require your response no later than the close of business, Tuesday, June 27, 1995. You are hereby placed on notice that our clients maintain that your manufacture, distribution and/or sale of The Unauthorized Album constitutes a violation of their legal and equitable rights for which they will hold you, and any person or company acting in concert with you, fully accountable.

GOLD, FARRELL & MARKS

Mr. Jeffrey Collins
June 22, 1995
Page 3

        For your information, enclosed is a consent
order we obtained against Sony Music Entertainment, Inc.
and others on September 14, 1993, relating to similar
recordings manufactured from unauthorized tapes which also
originated at the Star Club.  Please be aware that we are
prepared to take all necessary action to protect our
clients' rights regarding "Jammin' with . . . The Beatles
'62."

                        Very truly yours,

                        Paul V. LiCalsi

PVL:bla

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x

APPLE CORPS LIMITED, and APPLE          :
RECORDS, INC.,
                                        :    91 Civ. 7465 (CSH)

              Plaintiffs,               :    CONSENT ORDER

         -against-                      :    AND ORDER OF
                                             DISCONTINUANCE
SONY MUSIC ENTERTAINMENT, INC., LEE     :
HALPERN, LAWRENCE HALPERN,
MICHAEL HALPERN, and DOUBLE H           :
LICENSING CORPORATION,
                                        :
              Defendants.
                                        :

--------------------------------------x

        WHEREAS, on or about October 16, 1991, Apple Corps Ltd.

and Apple Records, Inc. ("Apple" or "plaintiffs") commenced an

action against Sony Music Entertainment, Inc. ("Sony") and Lee

Halpern, Larry Halpern and Michael Halpern in the Supreme Court

of the State of New York, New York County, Index. No. 28363/91,

which was removed by defendants on or about November 4, 1991 to

the federal district court of the Southern District of New York,

No. 91 Civ. 7465 (CSH) (the "Action");

        WHEREAS, Double H Licensing Corporation was added as a

defendant in the Action (Lee Halpern, Larry Halpern, Michael

Halpern and Double H Licensing Corporation are hereinafter

referred to as the "Halpern defendants");

        WHEREAS, plaintiffs brought this action against

defendants seeking money damages and permanent injunctive relief

on the alleged basis, <u>inter alia</u>, that plaintiffs had not authorized the licensing, manufacture, distribution or sale of certain Records[1] derived from audio tapes of a live performance by the Beatles in 1962 at the Star Club in Hamburg, Germany (the "Beatles Masters") or the use of the Beatles' names and likenesses in connection with the Beatles Masters and Records derived therefrom;

WHEREAS, on or about November 27, 1991, defendants answered the complaint in the Action, denying the material allegations thereof and asserting various affirmative defenses of, <u>inter alia</u>, laches, estoppel, waiver and acquiescence;

WHEREAS, the Halpern defendants purport that they own full rights, title and interest to the Beatles Masters, subject only to an agreement dated July 1, 1991 between Sony and Larry Halpern and Michael Halpern (the "Halpern/Sony Agreement");

WHEREAS, while defendants do not concede that they failed to obtain proper authorization to license, manufacture, distribute and sell such Beatles Masters and Records derived therefrom or to use the Beatles' names and likenesses in connection therewith, or the merit of any of the claims asserted in plaintiffs' pleading, and plaintiffs do not concede the merit of any defense raised by defendants or any lack of merit to their

---

[1]   As used herein, the term "Records" means all forms of reproductions of sound, whether or not accompanied by visual images, in any form or medium now known or hereafter devised, including but not limited to tape cassettes and compact discs.

-2-

affirmative claims, and for the sole purpose of settling disputed claims and defenses in this action, and to avoid the expenses and uncertainties of litigation, the parties have consented to the issuance of this Order;

NOW, THEREFORE, the parties hereto are ordered as follows:

A.  The defendants and each of them, and all persons in active concert with them, permanently shall not, directly or indirectly, (i) reproduce, manufacture, press, copy, release, distribute, sell, market, license or otherwise dispose of or exploit in any manner the Beatles Masters and Records derived therefrom, or (ii) use the Beatles' names or likenesses for any purpose in connection with the Beatles Masters and Records derived therefrom;

B.  Within ten days of the entry of this Order, the Halpern defendants shall surrender and transfer to plaintiffs' counsel, Gold, Farrell & Marks, any and all masters which contain in whole or in part the Beatles Masters, including but not limited to all tapes, acetates, stampers, mothers, films or duplicates thereof and any other items used in the licensing or manufacturing of the Beatles Masters or Records derived therefrom or the printing of associated packaging or other materials and Sony shall surrender and transfer to plaintiffs any and all masters and other materials supplied to it by the Halpern defendants pursuant to the Sony/Halpern Agreement;

-3-

C. Within ten days of the entry of this Order, defendant Lee Halpern shall execute and deliver to plaintiffs' counsel, Gold, Farrell & Marks, an affidavit in the form annexed hereto as Exhibit A;

D. Except for the masters and other materials surrendered to plaintiffs' counsel pursuant to paragraph B, supra, Sony and all companies affiliated with Sony shall within twenty days of the entry of this Order destroy 1) all Beatles Masters and Records derived therefrom in its custody, possession or control; 2) all parts in its possession by which such Beatles Masters and Records derived therefrom were reproduced, manufactured, distributed and sold, including but not limited to master recordings, tapes, acetates, stampers, mothers, films or duplicates thereof and any other items used in the manufacture, distribution or sale of the Records or printing of associated packaging or other materials; and thereafter shall promptly ndestroy any additional Records which are returned to it;

E. Within twenty days of the entry of this Order, Sony through one of its officers shall execute and deliver to plaintiffs' counsel Gold, Farrell & Marks an affidavit in the form annexed hereto as Exhibit B;

F. Hereafter any and all of defendants' purported right, title and interest in and to the Beatles Masters and the performances contained thereon are transferred to plaintiff Apple Corps Limited;

-4-

G.   The Halpern defendants represent that except for the Sony License of July 1, 1991 there are no outstanding licenses or grants of right in or to the Beatles Masters;

H.   Sony represents that neither it nor any of its affiliated companies have licensed any right to, or use of, the Beatles Masters and Records derived therefrom to any entity which is not an affiliated company of Sony;

I.   The parties shall bear their own costs, attorneys fees and expenses;

J.   Plaintiffs, and plaintiff Apple Corps Limited's shareholders, Paul McCartney, George Harrison, Richard Starkey and the Estate of John Lennon, for themselves, their heirs, assignees and successors in interest, hereby release, acquit and forever discharge Sony, the Halpern defendants, their agents, directors, officers, employees, successors, assigns, licensees, distributors, contractors, and any persons, companies, corporations or entities acting on their behalf (the "Defendant Releasees") of and from any and all claims, causes of action in law, or equity, suits, debts, liens, promises, demands, liabilities, damages, losses, costs or expenses of any nature whatsoever whether presently known or unknown, fixed or contingent which they have, or ever had, against the Defendant Releasees or any of them by reason of any matter, causes or events arising or existing as of the date of this Order relating to the commercial exploitation of the Beatles Masters and Records

-5-

derived therefrom; <u>provided</u> however that nothing in this paragraph releases any Defendant Releasee from the effect of any order of any court entered prior to this date;

K.    Defendants, their heirs  assignees and successors in interest, hereby release and forever discharge the Plaintiffs, their shareholders, agents, directors, officers, employees, successors, assigns, licensees, distributors, contractors, and any persons, companies or entities acting on their behalf (the "Plaintiff Releasees") of and from any and all claims, causes of action in law, or equity, suits, debts, liens, demands, liabilities, damages, losses, costs or expenses of any nature whatsoever whether presently known or unknown, fixed or contingent which they have, or ever had, against the Plaintiff Releasees or any of them by reason of any matter, causes or events arising or existing as of the date of this Order relating to the commercial exploitation of the Beatles Masters and Records derived therefrom;

-6-

ORDERED, that subject to the terms prov ded for herein
this action is hereby discontinued, with prejudice.

Dated:  New York, New York
        July  30 , 1993


SONY MUSIC ENTERTAINMENT, INC.         APPLE CORPS LIMITED AND
                                       APPLE RECORDS, INC.


_____        _____
Steven M. Hayes (SH  2926   )          Paul V. LiCalsi (PL 6644)
Parcher & Hayes, P.C.                   Gold, Farrell & Marks
500 Fifth Avenue                        41 Madison Avenue
New York, New York  10110               New York, NY  10010


LEE HALPERN, LAWRENCE HALPERN
MICHAEL HALPERN and DOUBLE H
LICENSING CORPORATION

_____
Stewart L. Levy  (SL  r/  )
Eisenberg Tanchum & Levy
477 Madison Avenue
New York, New York  10022


                                  So Ordered: 9(14(93

                                  _____
                                  United States District Judge


                        -7-

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x

APPLE CORPS LIMITED, and APPLE          :
RECORDS, INC.,
                                        :    91 Civ. 7465 (CSH)

                   Plaintiffs,          :    AFFIDAVIT

              -against-                 :

SONY MUSIC ENTERTAINMENT, INC., LEE     :
HALPERN, LAWRENCE HALPERN,
MICHAEL HALPERN, and DOUBLE H           :
LICENSING CORPORATION,
                                        :
                   Defendants.
                                        :

-------------------------------------x


STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF WESTCHESTER  )

          LEE HALPERN, being duly sworn, deposes and says:

          1.  I am a defendant in this action and an officer of

defendant Double H Licensing Corporation ("Double H").

          2.  I hereby confirm that all masters of the Beatles

Masters, as defined by the Consent Order pertaining to this

action dated July $3^{\circ}$ , 1993, including but not limited to all

tapes, acetates, stampers, mothers, films or duplicates thereof

and any other items used in the licensing or manufacturing of the

Beatles Masters or Records, as defined in the Consent Order,

derived therefrom or printing of associated packaging or other

materials have been surrendered to the custody and control of plaintiffs' counsel Gold, Farrell & Marks.

    3.  I further confirm that none of the Halpern defendants, as defined in the Consent Order, nor Double H has retained any copies of the materials listed in paragraph 2 above.

_____
LEE HALPERN

Sworn to before me this
____ day of _____, 1993

_____
NOTARY PUBLIC

STEWART LAWRENCE LEVY
Notary Public, State of New York
No. 02 LE 4574890
Qualified in Westchester County
Commission Expires November 30, 1994

-2-

<u>Exhibit B</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

APPLE CORPS LIMITED, and APPLE     :
RECORDS, INC.,
                                   :   91 Civ. 7465 (CSH)

             Plaintiffs,           :   <u>AFFIDAVIT</u>

             -against-             :

SONY MUSIC ENTERTAINMENT, INC., LEE :
HALPERN, LAWRENCE HALPERN,
MICHAEL HALPERN, and DOUBLE H      :
LICENSING CORPORATION,
                                   :
             Defendants.
                                   :

------------------------------------x

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

        VINCENT S. PASCUCCI, being duly sworn, deposes and
says:

        1.  I am Director of Business Affairs, Sony Special
Products, of Sony Music Entertainment Inc.  I am furnishing this
affidavit to the plaintiffs pursuant to the terms of a Consent
Order entered in this action dated August ___, 1993.

        2.  I hereby confirm that all master recordings and
other materials supplied to Sony pursuant to the Halpern/Sony
Agreement, as defined in the Order, have been surrendered to the
custody and control of plaintiffs' counsel Gold, Farrell & Marks.

3.   Except for the masters and materials referred to in paragraph 2, above, I hereby confirm the destruction of all Records reproducing the performances contained on the Beatles Masters, as those terms are defined in the Consent Order, in the custody, possession or control of Sony and of its affiliated companies.

4.   Except for the masters and materials referred to in paragraph 2, I hereby confirm the destruction of all of the Beatles Masters and of all parts in Sony's and its affiliated companies' custody, possession or control by which Records were reproduced from the Beatles Masters, including but not limited to master records, tapes, acetates, stampers, mothers, films or duplicates thereof and any other items used in the manufacture, distribution or sale of the Records or printing of associated packaging or other materials.

5.   I further confirm that Sony shall destroy any additional Records which were reproduced from the Beatles Masters which are hereafter returned to Sony.

*Vincent Scott Procucci*

Sworn to before me this
18th day of _August_ , 1993

*Denise Y. Simmons*
NOTARY PUBLIC
DENISE Y. TIMMONS
Notary Public, State of New York
No. 31-4701762
Qualified in New York County
Commission Expires September 2, 1993

−2−

# EXHIBIT  J





*ancefloor*
*istribution*
*Disc-tinct Music Inc.*

*95 Cedar Lane • Englewood, NJ 07631 • Telephone: 201-568-7066 • Fax 201-568-8699*

July 17, 1995

Paul V. LiCalsi, ESQ
Gold, Farrel & Marks
41 Madison Avenue
New York, New York  10010-2201

Re: <u>**Jammin' with the Beatles '62**</u>

Dear Paul,

Further to our recent telephone conversation, we are more than upset to hear that the Apple Corporation is not willing to work with us on this project.

Obviously, without their consent we have absolutely no intention of commercially releasing the album.  We are also willing to sign an undertaking not to do so.

In exchange we would be prepared to accept a 'reasonable' payment to compensate us for our honest endeavour of preparing for the release of this album.

A considerable amount of ground-work, time and expense has been incurred which are detailed in our addendum and totals $25,000.

We are also in agreement to sell to the Apple Organization the set of 'original' Star Club recordings - as well as the 'finished' master-tape  of **"Jammin' with the Beatles '62"** for an acceptable offer commensurate with that of a private collector.

Please find enclosed a full color copy of the album L.P. jacket.

Yours sincerely,

Jeffrey Collins
President                                                    * copy by fax

JC/ss



Addendum to letter dated 7/17/95
From: Dancefloor Distribution

| | | |
|---|---|---|
| 1. | Various applications for searches to be made by United States Copyright Office to accertain authenticity of ownership of original tapes. | $    200 |
| 2. | Applications made to Harry Fox Agency for licenses to use songs chosen.  Searches for songwriters etc. | $    500 |
| 3. | Transfer of recordings  from original 1/4" reels to 2" reels in original state as safety copies. | $  1,500 |
| 4. | Transfer from 2" to DAT | $    200 |
| 5. | Noise Reduction | $  3,000 |
| 6. | Editing and repair on drop-outs. | $  1,500 |
| 7. | E.Q. ing and mastering for L.P., C.D. and cassette. | $  2,000 |
| 8. | Artwork includes: Finished syquest discs for front and back cover designs in full color for L.P., C.D. and cassette.  Including the type setting and logos (after several changes), plus art work for L.P./Cassette and C.D. labels. | $ 12,000 |
| 9. | Metal-work, stampers and test pressings for L.P. | $    800 |
| 10. | Special Preparation for the multi-image presentation of  the Compact Discs. | $  2,000 |
| 11. | Time spent on the project by staff (nominal amount) | $  1,300 |
| | **Total** | $ 25,000 |

# EXHIBIT  K

GOLD, FARRELL & MARKS

ATTORNEYS AND COUNSELORS AT LAW

FORTY-ONE MADISON AVENUE

NEW YORK, N. Y. 10010-2201

(212) 481-1700

FACSIMILE (212) 481-1722

MARTIN R. GOLD
LEONARD M. MARKS
RAYMOND J. HESLIN
PAUL V. LICALSI
JANE G. STEVENS
ALAN R. FRIEDMAN
CHRISTINE LEPERA
CHARLES R. DICKEY

———

ROBERT P. MULVEY

———

JEANNIE COSTELLO
MARK N. DILLER
JENNIFER A. KRANE
MARK S. LAFAYETTE
AMY J. LIPPMAN
GILLIAN M. LUSINS
MICHAEL D. MANUELIAN
DEBRA A. MAYER
THOMAS P. McCAFFREY
L. LONDELL McMILLAN
CHARLES S. SULLIVAN
HOWARD H. WELLER
LINDA YASSKY

THOMAS R. FARRELL
COUNSEL

October 24, 1995

<u>VIA FACSIMILE AND MAIL</u>

Mr. Jeffrey Collins
Echo International
Disc-Tinct Music, Inc.
Dancefloor Distribution
95 Cedar Lane
Englewood, New Jersey  07631

Re:  <u>"Jammin' with . . . The Beatles '62"</u>

Dear Jeffrey:

I am in receipt of your fax.  I apologize for not getting back to you sooner, but, as I know you are aware, Apple Corps Ltd. has been extraordinarily busy with The Beatles Anthology.

After a review of the tapes, Apple has indicated that they are not interested in a purchase.  I regret that you expended effort and money on this project without having first contacted Apple.

I appreciate your cooperative approach, and your indication that you will not exploit any performance by The Beatles without Apple's consent.  For the avoidance

GOLD, FARRELL & MARKS

Mr. Jeffrey Collins
October 24, 1995
Page 2

of doubt, I reiterate Apple's rights as set forth in my
letter to you dated June 22, 1995.

Very truly yours,

Paul V. LiCalsi

PVL:sg